Harold ADKINS, et al., Plaintiffs–
Appellees,

v.

MID–AMERICAN GROWERS, INC.,
Defendant–Appellant.

No. 98–1842.

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 9, 1998.

Decided Jan. 29, 1999.

Rehearing Denied March 10, 1999.

Donald R. Brewer, Dundee, IL; John W. Billhorn (argued), Chicago, IL, for Harold Adkins.

John W. Billhorn (argued), Chicago, IL, for James Burger and Patricia Ann Watson.

Carl E. Johnson (argued), Anthony B. Byergo, Seyfarth, Shaw, Fairweather & Geraldson, Chicago, IL; Douglas A. Gift, Herbolsheimer, Lannon, Henson, Duncan & Reagan, LaSalle, IL, for Mid-American Growers, Inc.

Before POSNER, Chief Judge, and CUDAHY and COFFEY, Circuit Judges.

POSNER, Chief Judge.

This suit by 122 hourly workers at Mid–American Growers, a large Illinois producer of flowers and flowering plants, charges Mid–American with violating the overtime provisions of the Fair Labor Standards Act, 29 U.S.C. §§ 201 *et seq.* The district court conducted a trial limited to the applicability of section 213(b)(12) of the FLSA—the agricultural exemption. He found the exemption inapplicable, 965 F.Supp. 1076 (N.D.Ill.1997), and later granted the plaintiffs summary judgment on the remaining issues and ordered the defendant to pay a total of $115,-000 in overtime pay and liquidated damages.

The core of Mid–American's operation is a 1 million square foot greenhouse in which the company grows and sells more than a million plants every year. "Agriculture"

within the meaning of the Fair Labor Standards Act "includes farming in all its branches and among other things includes ... the production, cultivation, growing, and harvesting of any ... horticultural commodities," 29 U.S.C. § 203(f), and the district judge found that nearly 98 percent of Mid–American's sales, consisting of plants grown "from scratch" (that is, from seeds, bulbs, cuttings, or starter plants), are uncontroversially within the exemption. The controversy centers on the other 2 percent of Mid–American's sales, which are of mature plants purchased from other growers. Most of these are foliage plants that Mid–American purchases from growers in the South, mainly Florida. Because Mid–American's sales area has a colder climate than the areas from which these plants come, the plants' prospects for flourishing in their new environment are enhanced if they undergo a process called "acclimatization." The process involves subjecting the plants in Mid–American's greenhouse, prior to sale, to reduced levels of light, temperature, humidity, and fertilizer in order to foster a smooth transition to the harsher environment in which the plants are to live after they are sold. The process takes two to six weeks but some of the plants are sold sooner—some almost immediately—either because they look particularly robust or because customers want them regardless. The acclimatization process clearly is agricultural; it is a form of "cultivating ... the growing crop." 29 C.F.R. § 780.205(c).

In addition to the southern foliage plants, Mid-American buys some mature plants from other growers in order to cover its obligations, either contractual or customary, to its customers in the event that its own production is inadequate because of blight or other disasters. Sometimes, however, Mid–American has an excess of customer orders over available production not because of a production shortfall but because it has accepted more orders than even its normal production capacity can fill, and then it buys the plants it needs in order to fill these orders from other growers and resells the plants without doing any agricultural work on them.

When Mid–American buys plants and then resells them without doing significant agricultural work it is operating as a wholesaler rather than as a grower, and wholesalers of agricultural commodities are not exempt from the Act. *Wirtz v. Jackson & Perkins Co.,* 312 F.2d 48, 51 (2d Cir.1963); *Mitchell v. Huntsville Wholesale Nurseries, Inc.,* 267 F.2d 286, 290–91 (5th Cir.1959). But the agricultural exemption does cover nonagricultural activities that are incidental to the core activities that the statute exempts. For it defines "agriculture" to include not only farming per se (and remember that "farming" includes horticulture) but also "any practices ... performed by a farmer or on a farm as an incident to or in conjunction with such farming operations." 29 U.S.C. § 203(f); see *Holly Farms Corp. v. NLRB,* 517 U.S. 392, 398, 116 S.Ct. 1396, 134 L.Ed.2d 593 (1996); *Bayside Enterprises v. NLRB,* 429 U.S. 298, 300–01, 97 S.Ct. 576, 50 L.Ed.2d 494 (1977); *Farmer's Reservoir & Irrigation Co. v. McComb,* 337 U.S. 755, 762–70, 69 S.Ct. 1274, 93 L.Ed. 1672 (1949). The cases call such activities "secondary agriculture." There are two uncontroversial examples in the present case. Work connected with the sale of flower pots (also planters and other containers) is exempt even when the pots are sold without any plants or flowers in them. And work connected with those cover purchases that Mid–American makes because of production shortfalls, though not those it makes merely because of an excess of orders over normal production, is also exempt. *Wirtz v. Jackson & Perkins Co., supra,* 312 F.2d at 51; *Walling v. Rocklin,* 132 F.2d 3, 7 (8th Cir.1942).

That leaves the southern foliage plants that are sold without being acclimatized and the cover purchases not warranted by production shortfalls. These two categories of nonexempt "wholesaling" account for some unknown but presumably small percentage of the 2 percent of Mid–American's sales that is not conceded to be exempt. The percentage of a percentage is unknown because Mid–American does not keep records of which sales fall into these categories. The district judge held that since *some* of Mid–American's sales were nonexempt, *all* its

workers' overtime was subject to the FLSA. He awarded double damages because he thought that Mid–American had no reasonable basis for thinking exempt the sales that he ruled nonexempt. 29 U.S.C. §§ 216(b), 260; *Shea v. Galaxie Lumber & Construction Co.*, 152 F.3d 729, 733 (7th Cir.1998); *Avitia v. Metropolitan Club of Chicago, Inc.*, 49 F.3d 1219, 1223 (7th Cir.1995).

The underlying reason why the agricultural exemption includes some nonagricultural activity is that it is not always feasible to separate agricultural from nonagricultural labor. The problem is illustrated by flowers that are sold in pots. If a worker works on such a product more than 40 hours a week, is the overtime agricultural or nonagricultural? It is both, but since the nonagricultural component is minor and inseparable, and since the FLSA does not permit overtime pay to be prorated for a worker who does both exempt and nonexempt work, 29 C.F.R. § 780.11; *Skipper v. Superior Dairies, Inc.*, 512 F.2d 409, 411 (5th Cir.1975), the employer is given a break and the work classified as entirely agricultural. To deny him the break would burden the efficient integration of closely related activities, especially in situations in which the amount of nonexempt activity is too slight to warrant the expense of a separate work force. See, e.g., *Damutz v. Pinchbeck,* 158 F.2d 882 (2d Cir.1946) (per curiam). But where the nonexempt activity can be feasibly separated from the exempt, the separation is essential to prevent agricultural enterprises from obtaining an artificial competitive advantage over enterprises that do not enjoy an exemption from the Fair Labor Standards Act.

The interaction of these principles is illustrated by *Maneja v. Waialua Agricultural Co.*, 349 U.S. 254, 75 S.Ct. 719, 99 L.Ed. 1040 (1955), in which railroad and repair shop, as well as sugar cane, workers employed by a producer of sugar cane were held to be included in the exemption but the workers at a separate processing plant were held to be excluded. The Court emphasized both the "necessity of integrating ... [carriage and repair] with Waialua's main operation," *id.* at 263, 75 S.Ct. 719; cf. *Farmers Irrigation Co. v. McComb, supra,* 337 U.S. at 760–62, 69 S.Ct. 1274; *Reich v. Tiller Helicopter Services, Inc.,* 8 F.3d 1018, 1029 (5th Cir.1993), and the arbitrary competitive advantage that the enterprise would enjoy over competing sugar processors if the exemption extended to the processing plant. *Maneja v. Waialua Agricultural Co., supra,* 349 U.S. at 269, 75 S.Ct. 719; see also 29 C.F.R. § 780.146.

The record in the present case unfortunately does not reveal whether it is feasible to separate out from the work done on the exempt activities the work done on nonexempt activities. It is true that all the southern foliage plants are in one part of Mid–American's greenhouse. But it is only a subset of these that are not exempt as primary agriculture—those plants that are resold before they have been acclimatized plus plants bought for purposes of cover not necessitated by a production shortfall. It *may* be feasible to segregate these two categories of plant or to assign particular workers to work full time on them. But then again it may not be. Work on the two categories of plant constitutes only a tiny fraction—perhaps no more than one-half of 1 percent—of Mid–American's labor. Mid-American's work force fluctuates over the course of the year between about 90 and about 150 workers. One-half of 1 percent of 90 or even 150 workers is less than one worker, so that if one worker were assigned full time to the two arguably nonexempt activities he would be underemployed. If the worker were also assigned exempt work, the employer would lose the exemption for this worker as soon as he worked overtime, whether it was on exempt or nonexempt activity. And since, when it receives shipments of southern foliage plants, Mid–American doesn't know which ones will be sold first, before acclimatization, it is unclear whether it would be feasible to segregate those plants from the others so that workers would know when they were doing nonexempt work. Maybe plants could be tagged with the date of their arrival so that those resold within a week or two would be known to be nonexempt. Or maybe not. The record is silent on these questions.

As we noted earlier, a flower wholesaler cannot gain immunity from the FLSA by

buying a greenhouse any more than retail florists are immune from the Act by virtue of having greenhouses, as many of them do. But there is no suggestion that Mid–American is primarily a wholesaler or that it engages in nonexempt activities for the purpose of obtaining a cost advantage over wholesalers. The tiny percentage of its nonexempt activities belies such an inference. The issue of the feasibility of its compliance with the FLSA is thus a real one.

At argument we pressed the plaintiffs' counsel on possible modes of compliance and he suggested that Mid–American simply stop buying plants, that it grow them all from scratch. Yet it is *conceded* that cover purchases necessitated by production shortfalls are exempt as secondary agriculture and that the process of acclimatizing plants for northern climes is exempt as primary agriculture. If it is impossible for Mid–American to engage in concededly core exempt activities (primary agriculture) without losing its exemption unless it also engages in a tiny amount of peripheral activity not strictly agricultural, the latter activity is secondary agriculture and so is also exempt. If it can feasibly separate out the nonexempt work, and thus comply with the FLSA without having to abandon either agriculture or the agriculture exemption, then it must do so. These questions require a remand to sort out.

■■ But in one respect that we have not yet mentioned no remand is necessary. Mid–American's president has his home on the property on which the greenhouse is located, and one of the plaintiffs, Ortiz, was assigned to mow the president's lawn and do other gardening-type activities around the house. This clearly was nonexempt activity, and because Ortiz worked overtime he is entitled to damages. It is true that an incidental effect of mowing the president's lawn was to reduce the insect population, which might endanger the plants if some of the insects strayed into the greenhouse. But the primary purpose was to make the president's home attractive; pest control was secondary. A nonagricultural activity that would be undertaken even if the actor weren't engaged in agriculture is not secondary agriculture; its cost is not incurred because of agriculture.

We have an independent concern with the calculation of damages for the plaintiffs other than Ortiz. The doubling of damages was proper only if Mid–American had no reasonable basis for believing itself completely exempt from the FLSA, and it should be clear from the earlier discussion that it may well have had reason to believe itself exempt, except with regard to Ortiz. Final determination of this question must abide the remand, which may conceivably reveal methods of compliance so simple and so well-known in the industry that Mid–American can have no excuse for having failed to use them.

■ The calculation of compensatory damages (that is, the damages before they were doubled) was also problematic, because of the absence of evidence concerning which workers worked on the activities that the district court found to be exempt. It is true that a worker who does *any* nonexempt work in a week is entitled to the statutory time and a half for all his overtime that week; and all the plaintiffs did some overtime during the period covered by the suit. But given the minute amount of arguably nonexempt work relative to concededly exempt work, it is pure guesswork that *all* the plaintiffs did at least some nonexempt work during the weeks in which they worked overtime; and there is no evidence of how many did. Although the defendant has the burden of proving entitlement to the agricultural exemption, *Corning Glass Works v. Brennan*, 417 U.S. 188, 196–97, 94 S.Ct. 2223, 41 L.Ed.2d 1 (1974), the worker has the burden of proving that he did nonexempt work. *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 686–87, 66 S.Ct. 1187, 90 L.Ed. 1515 (1946); *Imada v. City of Hercules*, 138 F.3d 1294, 1296 (9th Cir.1998).

The burden must not be made unmanageable. It might be enough for the plaintiffs to show that, given work patterns and assignments, 10 percent, say, of Mid–American's workers probably did some nonexempt work during their overtime weeks, even if it were impossible to prove which workers they were; and then perhaps all the workers in the class could divide the pie. Cf. *Sindell v.*

*Abbott Laboratories,* 26 Cal.3d 588, 163 Cal. Rptr. 132, 607 P.2d 924 (Cal.1980); *Krist v. Eli Lilly & Co.,* 897 F.2d 293 (7th Cir.1990); *Zuchowicz v. United States,* 140 F.3d 381, 388 n. 6 (2d Cir.1998). Each would have suffered a probabilistic harm measured by his fractional share of the total amount of nonexempt work done by Mid–American's work force. No effort at such calculations has been made.

True, it was Mid–American's burden to keep records that would enable a determination of which workers did nonexempt work in the weeks in which they worked overtime. 29 U.S.C. § 211(c); *Anderson v. Mt. Clemens Pottery Co., supra,* 328 U.S. at 687, 66 S.Ct. 1187. But there is, once again, an issue of feasibility. If it is feasible to keep such records and Mid–American should have known this, well and good; the failure to keep records would be a potent argument for resolving all reasonable doubts about damages against Mid–American. (If it is feasible and if Mid–American should have known that it was violating the Act, then the absence of records would also be evidence of bad faith. *Dove v. Coupe,* 759 F.2d 167, 176 (D.C.Cir. 1985).) But if it is infeasible to require a defendant to lay on its workers the burden of keeping a counterpart to a lawyer's time sheets, documenting each day on which he both did overtime work and worked on a nonexempt activity, then the defendant can't be blamed for not having such records. See 29 C.F.R. § 785.47; *Reich v. New York City Transit Authority,* 45 F.3d 646, 650 (2d Cir. 1995); *Lindow v. United States,* 738 F.2d 1057, 1062 (9th Cir.1984). Suppose an overtime worker's job assignment is unloading southern foliage plants at Mid–American's loading dock. How could he know which if any of the plants that he was unloading would be resold so soon as to fall outside the exemption for acclimatizing? Must he number each plant and record the number on a sheet that has his name on it so that Mid–American can determine, when the plant is sold, whether it was a nonexempt or an exempt plant and if the former who worked on it? If record-keeping is infeasible but on remand the class again prevails on liability, an alternative method of computing damages,

such as the market share method used in DES cases like *Sindell,* should be considered.

We do not wish to prejudge the remand. It may reveal that Mid–American can, despite the doubts we have expressed, readily comply with the Fair Labor Standards Act without having to abandon clearly exempt forms of agricultural production. If so, the district judge should reinstate his finding of liability (other than in Ortiz's case, as to which we affirm), but he will still have to give further consideration to the issue of damages.

A couple of loose ends remain to be tied up. First, the plaintiffs ask us, if we reverse the award of double damages, to award prejudgment interest instead. We could consider such a request, for a modification of the judgment of the district court in the appellees' favor, only if the plaintiffs had filed a cross-appeal, which they have not done. *Doll v. Brown,* 75 F.3d 1200, 1207 (7th Cir.1996). Second, Mid–American complains about the district court's reinstating a number of plaintiffs who had failed to show up at their scheduled depositions or otherwise failed to cooperate in discovery. It is premature for us to rule on this complaint. On the view the district judge took of the case, he didn't have to determine which workers did nonexempt work and so the inability of Mid–American to question them was unimportant. It may become important on remand, in which event the judge will want to revisit the ruling.

The judgment is affirmed in part, vacated in part, and remanded for further proceedings consistent with this opinion.