Clarence W. HEATH, et al.

v.

PERDUE FARMS, INC.

Civil Action No. WMN–98–3159.

United States District Court, D. Maryland.

Feb. 24, 2000.

Edgar N. James, James & Hoffman, P.C., Washington, DC, Deborah M. Thompson, Monique L. Dixon, Jonathan M. Smith, Debra Lynn Gardner, Baltimore, MD, Judith M. Conti, James & Hoffman, P.C., Washington, DC, for Plaintiffs.

Bryan D. Bolton, Funk & Bolton, P.A., Baltimore, MD, Gregory P. McGuire, Haynsworth, Baldwin, et al., Raleighoro, NC, Glenn L. Spencer, Haynsworth Baldwin Johnson & Greaves, Raleigh, NC, John G. Creech, Haynsworth Baldwin Johnson & Greaves, Greenville, SC, Paula Wright Coleman, Steven J. Mandel, U.S. Dept. of Labor, Washington, DC, for Defendant.

### *MEMORANDUM*

NICKERSON, District Judge.

This is an action brought by over one hundred individuals employed as "chicken catchers" for processing plants owned and operated by Defendant Perdue Farms, Inc. in Salisbury, Maryland, Accomac, Virginia and Georgetown, Delaware. Plaintiffs seek to recover overtime wages to which they believe they are entitled under the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.* ["FLSA"], and similar provisions of the Maryland Wage and Hour Law, Md. Lab. & Emp.Code Ann. §§ 3–401 to 3–431. Presently before the Court are cross motions for summary judgment on the issue of liability. Paper Nos. 71 (Defendant's) and 73 (Plaintiffs'). Also before the Court are Plaintiffs' motion to permit joinder of and notice to individuals that catch chickens for Perdue's processing plant in Milford Delaware, Paper No. 79, and Plaintiffs' motion to permit joinder of an additional chicken catcher from Perdue's Salisbury plant, Oliver Hazzard, Paper No. 82. All the motions are fully briefed. Upon a review of the motions and the applicable case law, the Court determines that no hearing is necessary (Local Rule 105.6) and that Plaintiffs' motion for summary judgment should be granted. The Court will also grant Plaintiffs' motion for joinder of Oliver Hazzard, but will deny

the motion related to Perdue's Milford, Delaware facility.[1]

## I. FACTUAL BACKGROUND[2]

Perdue is a vertically integrated poultry operation which operates throughout the Delmarva region. Perdue hatches chickens in company owned hatcheries, and then ships them to independent contract farmers who raise them in accordance with Perdue's exacting specifications. Perdue, at all times, retains ownership of chickens. Once the chicks reach marketable age and size, chicken catchers travel to the contract farms, capture the chickens, and place them in cages for transport to the factory for slaughter.

Chicken catchers work in crews of approximately nine men: a crew typically consists of six catchers, one house man (who prepares the chicken houses before the catchers enter and nets the chickens), and one forklift driver, all under the supervision of a crew leader. Generally, the catchers, who collect at designated locations, are picked up by the crew leader who has retrieved a Perdue truck from the Perdue plant and has loaded the truck with necessary equipment. Most catchers ride to the farms in the Perdue crew cab because Perdue generally does not allow them to drive their own cars to the farms. The crew leaders are not allowed to vary or alter any of the instructions on the kill sheet.

The work of the catchers is physically arduous, dangerous and unpleasant. The chickens are caught by hand and stuffed into cages, which are then loaded onto Perdue trucks. Chicken catchers are paid by the piece rate, per 1000 chickens caught. The crews catch between 30,000 and 50,000 chickens each shift, and regularly work approximately 12 hours per shift for at least a five-day week; the workers do not receive overtime pay at time and one half for the hours worked over 40 hours per week.

The catchers' work, which is to deliver the raw material necessary for the operation of Perdue's poultry processing operation, is directly keyed to the work of the poultry processing plant in that the catching crews work only when a processing plant is operating; this includes working weekend and holidays depending on the slaughtering schedule at the plant. The crew leader, who is often a former chicken catcher, is presented with a contract by Perdue which specifies that the crew leader is an independent contractor and sets out the terms and conditions of the crew leader's work. None of the crew leaders have ever seriously negotiated any of the terms of their contracts or successfully challenged any of the contract provisions. The terms of the contract provide that the crew leaders will be paid on a weekly basis at a piece rate of between $28—$29 per 1000 chickens caught; this piece rate is based on the crew leader's estimated costs, and is very carefully calculated by Perdue. From this lump sum, the crew leader pays himself and the members of his crew.

The only other business expenses which the crew leaders incur are for workers' compensation insurance, bookkeeping services, and occasional expenses for personal protective equipment ["PPE"] such as dust masks, hard hats, and gloves which the crew leader purchases from the Perdue plant and provides to the catchers who choose to use the PPEs. In contrast, Per-

---

1. The United States Department of Labor ["DOL"] has also filed a motion for leave to file an amicus brief. Paper No. 72. The Court finds that, as the government agency responsible for the enforcement and administration of the FLSA, the DOL has sufficient interest in the consistent implementation of the Act to warrant DOL's participation in this suit as amicus.

2. The parties have developed an extensive factual record through discovery and have employed that record to present very detailed and lengthy statements of facts. The differences between these statements, however, are relatively minor and none of these differences are material to the issues raised in these motions. The following factual background is taken, in large part, from the more concise summary of facts provided by the DOL in its amicus brief. DOL Brief at 2–6.

due owns all the heavy equipment and machinery required for the chicken catching operation, including the trucks, cages, fork loaders, catching pens, nets, crew cabs, fans, hoses, and disinfectant tanks.

Perdue controls every significant aspect of the chicken catching operation. Daily "kill sheets" dictate virtually every aspect of the catchers work for the shift: the sheets instruct the crew leaders when, what time, and where to work; the order in which the chicken houses are to be entered on farms which have multiple chicken houses; how many chickens are to be stuffed into each cage; and how many loads of chickens the workers are expected to catch. The crew leaders are not allowed to vary or alter any of the instructions on the kill sheet. Throughout the shift, the Perdue live-haul manager is in constant contact with a crew leader, communicating additional instructions by way of radio in the Perdue crew cab. The Perdue live-haul manager also travels to the chicken houses at least two to three times a week to observe and critique the work, and issues letters and memoranda to the crew leaders on matters which the manager observes on these site visits.

## II. DISCUSSION

It is undisputed that Plaintiffs consistently work more than 40 hours per week and yet are not paid overtime wages. In this litigation, Perdue makes two main arguments as to why Plaintiffs are not entitled to overtime pay under the Fair Labor Standards Act. First, Perdue argues that Perdue is neither the sole nor "joint" employer of its chicken catchers. Instead, according to Perdue, Plaintiffs are the employees of the crew leaders, who are themselves independent contractors of Perdue. Second, Perdue argues that Plaintiffs qualify as "agricultural laborers," who are exempted from the overtime requirements of the FLSA. See 29 U.S.C. § 213(b)(12). Perdue makes similar arguments as to the inapplicability of the Maryland Wage and Hour Laws, i.e., that Perdue is neither the sole nor joint employer of Plaintiffs and that Plaintiffs are "engaged in ... [the]

first processing of poultry" and therefore exempt from Maryland's overtime laws. See Md.Code Ann., Labor & Employ. § 403(a)(10).

In addition to disputing each of these arguments in their cross-motion, Plaintiffs assert that Perdue's violation of the FLSA was "willful," thus rendering Perdue liable for three years of back overtime pay, as opposed to two years for non-willful violations. See 29 U.S.C. § 255(a)(stating that willful violations are subject to a three year statute of limitations). The Court will address each of these arguments, seriatim. The Court will then address the issues related to Plaintiffs' joinder motions.

### A. Plaintiffs' Employment Relationship with Perdue

For Perdue to be liable for overtime violations under the FLSA or Maryland's Wage and Hour Law, the Court must find that Perdue has an employment relationship with Plaintiffs. The relevant provisions of these statutes have defined the employment relationship very broadly, consistent with the remedial purpose of the legislation. The definition of "employ" under the FLSA includes "to suffer or permit to work." 29 U.S.C. § 203(g). Maryland's Wage and Hour Law defines "employ" in a similar manner: " 'employ' includes ... allowing an individual to work." Md.Code Ann., Labor & Empl. § 3–101(c). The Supreme Court has observed of FLSA's definition of the employment relationship that "[a] broader or more comprehensive coverage of employees within the stated categories would be difficult to frame." *United States v. Rosenwasser*, 323 U.S. 360, 362, 65 S.Ct. 295, 89 L.Ed. 301 (1945). *See also Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 326, 112 S.Ct. 1344, 117 L.Ed.2d 581 (1992)(Noting that FLSA defines the employment relationship "expansively" and as having a "striking breadth").

■ Courts have also stressed that the label that the parties give to their relation-

ship is not controlling. *See Real v. Driscoll Strawberry Assoc., Inc.*, 603 F.2d 748, 755 (9th Cir.1979). Thus, just because Perdue now[3] calls its crew leaders "independent contractors," does not exclude the crew leaders or the members of the crew from being considered employees for the purpose of the FLSA or the Maryland Wage and Hour Law. Courts look not to the label, but to the underlying "economic reality" of the relationship. *Rutherford Food v. McComb*, 331 U.S. 722, 67 S.Ct. 1473, 91 L.Ed. 1772 (1947); *Garrett v. Phillips Mills, Inc.*, 721 F.2d 979 (4th Cir. 1983).

■ To determine the economic reality of the relationship between workers and their putative employer, courts look at the following six factors:

1) the degree of control which the putative employer has over the manner in which the work is performed;

2) the opportunities for profit or loss dependent upon the managerial skill of the worker:

**3.** Perdue itself considered the crew leaders and catchers employees of Perdue until 1991 when it switched to the current "independent contractor" system.

**4.** These factors are considered to determine whether Perdue was the sole employer of the Plaintiffs. Plaintiffs also argue that, even were the Court to find that Perdue was not the sole employer, it is at least a "joint employer" of Plaintiffs, along with the crew leaders. The determination as to whether Perdue is a joint employer of its chicken catchers also involves a similar "economic reality," multifactor analysis. The factors in this analysis are:

  (1) ownership of the property and facilities where the work occurred;
  (2) degree of skill required to perform the job;
  (3) investment in equipment and facilities;
  (4) permanency and exclusivity of employment;·
  (5) nature and degree of control of the workers;
  (6) degree of supervision, direct and indirect, of the work;
  (7) power to determine the pay rates or the methods of payment of the workers;

3) the putative employee's investment in equipment or material;

4) the degree of skill required for the work;

5) the permanence of the working relationship; and

6) whether the service rendered is an integral part of the putative employer's business.

*Monville v. Williams*, 1987 WL 42404, 28 W & H Cas. (BNA) 497, 501 (D.Md.1987).[4]

■ Applying these factors to the undisputed facts presented makes it abundantly clear that Perdue is the employer of both the crew leaders and the chicken catchers.[5] As to the control factor, Perdue controls every aspect of the chicken catchers' work. It controls the farms they are to go to, the order in which individual houses are to be utilized, the times the catchers are to catch, how many chickens are to be caught, and how many chickens are to be placed in each cage. Every aspect of the operation is outlined in the "Live Haul Instructional Training Manual," published by Perdue. Perdue acknowledges that it

  (8) the right, directly or indirectly, to hire, fire, or modify the employment conditions of the workers; and
  (9) preparation of payroll and payment of wages.

*Ricketts v. Vann*, 32 F.3d 71, 76 (4th Cir.1994)(adopting this analysis from *Haywood v. Barnes*, 109 F.R.D. 568, 587 (E.D.N.C.1986)).
Obviously, there is considerable overlap and similarity of factors between the employer and joint employer analyses. Because the Court finds that Perdue was the employer of Plaintiffs for the purposes of the FLSA and Maryland's Wage and Hour Law, the Court need not consider this alternative analysis.

**5.** The Court will apply the analysis primarily to the crew leaders. If the crew leaders are found to be employees for the purposes of the FLSA, than the catchers are employees as well. *See Beliz v. W.H. McLeod & Sons Packing Co.*, 765 F.2d 1317, 1327 (5th Cir. 1985)("if the alleged contractor were held to be an employee of the farmer,·it would necessarily follow that the workers were in turn the farmer's employees").

provides "constant feedback" through the crew leaders as to whether the crews are meeting Perdue's performance standards. Motion at 24.[6]

It is also abundantly clear that the crew leaders have little opportunity to substantially increase their profit, nor do they expose themselves to much risk of loss. Crew leaders are paid at a set piece rate, a rate carefully calculated by Perdue. Perdue even pays a slightly higher piece rate to those crew leaders that have higher costs, thus assuring a consistent profit margin among the crew leaders. Furthermore, because the number of chickens to be caught is limited by Perdue, there is no occasion for extra pay or profit. Perdue comes close to conceding this point.[7]

The lack of potential for profit or loss is closely related to the next factor, the ownership of the equipment used to catch chickens. Perdue owns virtually all of the heavy equipment and machinery required for the catching operation. It owns the crew cabs, trucks, fork lifts, cages, fans, pens and nets. Perdue is responsible for the storage, maintenance, repair, fueling, and replacement of all the major equipment. In contrast, the crew leaders' investment in equipment is limited to computers used for bookkeeping and the personal protective equipment such as gloves and masks provided to some of the catchers.[8] The crew leaders' relative lack of capital investment in equipment is perhaps one of the strongest indicators that they are employees and not independent contractors. See Monville, 1987 WL 42404, 28 W & H Cas. at 502 (farm labor contractor found to be employee of farmer where his only capital contribution was use of bus to transport workers).

As to the degree of skill required to catch chickens, there is little doubt that catching chickens is unskilled labor. While Perdue argues that the job must be skilled because catchers become faster with experience, that is true of most repetitive tasks, skilled or unskilled. As to the crew leaders, their position does involve certain supervision and management skills. These skills, however, are the kind of generalized management skills commonly required of a foreman or supervisor. The need for these skills does not render the crew leader position that of an independent contractor. See Castillo v. Givens, 704 F.2d 181 (5th Cir.1983)(farm labor contractor who supervised workers, transported workers, kept records of laborers and hours, received weekly checks and distributed earnings to individual workers was employee of farm owner); Monville, 1987 WL 42404, 28 W & H Cas. at 501(crew leader with "overall supervision and control of the day-to-day activities of [farm workers]" was employee of farmer under FLSA).

The record also reveals that the crew leaders (and most of the catchers themselves) have long-standing, permanent, and exclusive relationships with Perdue. Most crew leaders have worked for Perdue for at least 10 years, some longer than 20 years. While Perdue makes much of the hypothetical possibility that the crew leaders could organize additional crews to work for competitors, the arduous demands of the job make that impractical and, the reality is that crew leaders work exclusively for Perdue. The same is also true for the catchers, for the most part. While a few catchers will occasionally moonlight for a competitor, or leave Perdue to go to another company, most work

---

6. Perdue explains that it must exercise such strict control because chickens are a perishable product, subject to the regulations of the USDA, as well as other industry standards. Mot. at 31. It makes no difference that there may be some external constraint necessitating Perdue's control, what matters is that Perdue does indeed exercise that control.

7. Perdue alludes to the hypothetical possibility of a slight profit or loss; "Contractors *can* experience profits or losses, *albeit small ones.*" Mot. at 25 (emphasis added).

8. Two crew leaders also have purchased vans to transport their crews. As least one of those crew leaders, however, is paid a slightly higher piece rate to compensate him for the use of his own vehicle.

exclusively for Perdue, and have done so for some time.

As to the final factor, Perdue concedes that "Plaintiffs 'perform a specialized job which is integral to Perdue's business.'" Motion at 18 (quoting Complaint at ¶ 19). Of necessity, the work of the catchers is highly coordinated with the schedule of Perdue's processing plants. Perdue depends on its catching crews for a steady supply of chickens for processing. Although geographically their work takes place outside the processing plants, the catchers' function, in a real sense, is simply part of the production line.

Using these factors to parse the economic realities of the relationship between Perdue and its crew leaders, leaves no doubt that theirs is an employer/employee relationship for the purpose of the FLSA and Maryland's Wage and Hour Law. The question then becomes, whether the nature of the work performed brings the catchers' employment within established exemptions to the statutes' overtime requirements.

## B. FLSA's "Agricultural Worker" Exemption

■ Although Perdue continues to treat as an open question the applicability of the "agricultural laborer" exemption to the employment of chicken catchers, this Court finds that the question was effectively resolved by the Supreme Court in its decision in *Holly Farms v. N.L.R.B.*, 517 U.S. 392, 116 S.Ct. 1396, 134 L.Ed.2d 593 (1996). *Holly Farms,* like the instant action, involved employees of a vertically-integrated poultry processor who worked in live-haul crews as chicken catchers, truck drivers, and loader operators. At issue was whether these employees were "agricultural" workers within the meaning of section 2(3) of the National Labor Relations Act ["NLRA"]. The Court held that the members of the live haul crews were not engaged in agriculture, in either a primary or secondary sense.

Primary farming, the Court noted, includes those occupations explicitly listed in the first part of § 3(f) of the FLSA, which includes the "raising . . . of poultry." 29 U.S.C. § 203(f). Secondary farming encompasses, "any practices . . . performed by a farmer or on a farm as an incident to or in conjunction with such farming operations, including preparation for market, delivery to storage or to market or to carriers for transportation to market." *Id.* The Court held that while the independent growers of broiler chickens under contract to the poultry processor were engaged in primary agriculture, the live-haul employees were not "themselves engaged in raising poultry." 517 U.S. at 400, 116 S.Ct. 1396. The Court also concluded that neither were the live-haul employees engaged in secondary agriculture, as their activities were more aligned with poultry processors' "slaughtering and processing activities," than with the poultry raising operations. *Id.* at 404, 116 S.Ct. 1396.

Perdue seeks to distinguish *Holly Farms* primarily on the ground that *Holly Farms* was decided under the NLRA, and not the FLSA. This Court notes, however, as did the Supreme Court in *Holly Farms,* that "agricultural laborer" has been given the same meaning under both regulatory schemes. Congress has expressly stated that "agricultural laborer, for NLRA § 2(3) purposes, shall derive its meaning from the definition of "agriculture" supplied by § 3(f) of the [FLSA]." *See Holly Farms,* 517 U.S. at 397, 116 S.Ct. 1396. Thus, the same analysis and considerations that led the Supreme Court to determine that chicken catchers are not agricultural laborers for the purposes of the NLRA, applies with equal force to this Court's determination as to whether they are agricultural laborers for the purpose of the FLSA. To the extent that the Supreme Court's decision was a result of deference to the NLRB as the agency responsible for the implementation of the NLRA,[9] similar

9. In reaching this conclusion, the Court notes that it was deferring to the position taken by the National Labor Relations Board. "We conclude . . . that the Board's position is

based on a reasonable interpretation of the statute, is consistent with the Board's prior holdings, and is supported by the Secretary of

deference to the position of the Department of Labor ["DOL"] on this issue is mandated in this action. The DOL, as the agency responsible for the implementation of the FLSA has consistently, since at least the early 1980's, taken the position that live-haul workers in the poultry industry are not agricultural workers and are entitled to overtime pay under the FLSA.[10]

Furthermore, federal courts have consistently held that the *Holly Farms* decision is applicable to cases arising under the FLSA. *See, e.g., Adkins v. Mid–American Growers, Inc.,* 167 F.3d 355, 357 (7th Cir. 1999); *Baldwin v. Iowa Select Farms, L.P.,* 6 F.Supp.2d 831, 836–37 (N.D.Iowa 1998). In fact, in just the last month, two federal district courts have issued decisions recognizing the applicability of the *Holly Farms* decision to cases involving chicken catchers and claims for overtime compensation under the FLSA. *Herman v. Continental Grain Co.,* 80 F.Supp.2d 1290 (M.D.Ala.2000); *Herman v. Tyson Products, Inc.,* 82 F.Supp.2d 631 (E.D.Tex. 2000). In contrast, Perdue has offered no decision from any court concluding that *Holly Farms* is not controlling in a FLSA case.

Thus, this Court finds that the agricultural laborer exemption is not applicable to Plaintiffs.

### C. Maryland's "First Processor" Exemption

■ While Perdue makes a perfunctory claim that Plaintiffs are excluded from coverage under Maryland's Wage and Hour Law as "first processors" of poultry, the argument is wholly unsupported. Mary-

land law defines "first processing" as "the procedure by which the form of a product or commodity is changed from its original state." COMAR 09.12.41.06(A). Simply catching chickens in preparation for transport does nothing to change them from their original state.

### D. Perdue's Willful Violation of the FLSA

■ The standard for determining whether Perdue's violation of the FLSA was "willful" is whether Perdue "either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute." *Reich v. Monfort, Inc.,* 144 F.3d 1329, 1334 (10th Cir.1998). The Court finds that under this standard, Perdue's violation was willful.

As discussed above, Perdue has relied on two arguments to support its continuing failure to comply with FLSA overtime provisions: its claim that the chicken catchers were not Perdue employees, and that, should they be considered employees, they were exempt under the FLSA agricultural laborer exemption. As to the first argument, it should have been abundantly clear to Perdue for some time that this argument had no merit. Prior to January 1, 1991, Perdue readily acknowledged that its crew leaders and chicken catchers were employees. In 1991, Perdue made an attempt to create a new system under which the crew leaders could be deemed independent contractors. In reality, however, nothing of substance changed in the manner in which Perdue related to its live haul crews except the manner in which they

---

Labor's construction of § 3(f)[of the FLSA]." 517 U.S. at 401, 116 S.Ct. 1396.

**10.** See DOL Amicus brief at 29 n. 8, discussing the various lawsuits in which the DOL has taken this position. The DOL has also recently issued several Opinion Letters, *see* Plaintiffs' Reply at 11 n. 7, and, of course, has filed an amicus brief in this action, advancing the same conclusion. While Perdue argues that DOL's position is not entitled to deference because DOL acted inconsistently (or at least inconspicuously) on this issue, Perdue has

pointed to no occasion where DOL has taken the contrary stance that live haul workers are agricultural workers. The Court finds that DOL's position is certainly clear at this point in time, and is entitled to this Court's deference. How long DOL has held this conclusion, and how clearly and in what manner it has communicated this position to the regulated community is more relevant to Perdue's "willfulness" in violating the FLSA overtime provisions. This willfulness issue will be discussed, infra.

were paid. An examination of each of the factors relevant to the determination as to whether an employer/employee relationship exists under the FLSA, as discussed above, forcefully demonstrates that the economic reality of the relationship remained unchanged.

Perdue has also been aware for some time that its attempt to disavow the employment relationship would not withstand scrutiny. In a Memorandum issued to Perdue in February 1995, an Internal Revenue Service Appeals Officer informed Perdue "[t]he facts indicate that except for the way the catchers were paid every thing about their work and their dealings with Perdue were the same before and after January 1, 1991." Plaintiffs' Motion, Ex. I. The Court notes that the IRS made the determination that the crew leaders remained employees of Perdue under the common law definition of "employee," a definition much narrower than that of the FLSA. For Perdue to continue to rely on the argument that the crew leaders and chicken catchers were not employees can only be construed as reckless disregard.

Admittedly, the applicability of the "agricultural laborer" exemption was more uncertain, at least until the Supreme Court's decision in *Holly Farms*. Prior to *Holly Farms*, at least one federal court had held that live haul employees were exempt under the agricultural exemption of the FLSA. *Coleman v. Sanderson Farms, Inc.*, 629 F.2d 1077 (5th Cir.1980), *reh'g denied*, 644 F.2d 34 (5th Cir.1981). As Plaintiffs acknowledge, even the DOL deferred any action on the issue after its position was rejected by the Fifth Circuit in *Coleman*.[11] Plaintiffs' Reply at 15.

After the issuance of the *Holly Farms* decision, however, the situation was drastically different. Any straightforward reading of the Supreme Court's decision makes it abundantly clear that the decision would apply to the agricultural exemption under the FLSA as well as the NLRA. While it was just recently that courts had the opportunity to directly rule on the issue, the

result was a foregone conclusion in light of the holding and reasoning of *Holly Farms*.

Nor can Perdue credibly argue that the DOL's position has been ambiguous since *Holly Farms*. Perdue states in their own pleadings that "[o]n the heels of the Supreme Court's decision in *Holly Farms*, the DOL began formulating a plan of attack that is now known as the Poultry Initiative," Def. Opp. at 5. That initiative was announced by the Secretary of Labor on November 26, 1996. As part of that initiative, the DOL conducted a national investigation of the wage practices in the poultry industry and then issued a statement that it had found that 60% of the poultry producers were not in compliance with FLSA overtime and recordkeeping requirements.

David Wylie, a partner in the law firm that represents Perdue in this litigation, gave a presentation concerning the initiative at the National Boiler Council's Board of Director's meeting on February 23, 1998, in which he stated:

> John Fraser, the Acting Wage and Hour Division Administrator, did clearly state that USDOL will pursue the FLSA enforcement cases that were identified in the survey. In this regard, those enforcement actions will proceed independently against catching crew leaders and poultry processing companies to recover the alleged back pay due for overtime violations concerning chicken catching employees.... Clearly, the Wage and Hour Division is concentrating on the chicken catching crews, and that area of the industry will be a battleground for the next year or so.

Plaintiffs' Ex. M at 3. Wylie also acknowledged in that presentation that "USDOL takes the position that the Supreme Court decision in the *Holly Farms* case effectively removed the agricultural exemption previously extended to catching crews." *Id.* (unnumbered attachment entitled "Wage/

---

11. The DOL filed an amicus brief in *Coleman* arguing that the exemption was inapplicable.

Hour Issues Concerning Catching Crews").

Once *Holly Farms* was issued, it was clear that chicken catchers were not exempt from FLSA overtime regulations. There is also no question that the poultry industry, including Perdue, knew that the DOL considered chicken catchers to be subject to those regulations. Despite this understanding, Perdue continued in its failure to comply with those regulations. The Court concludes that this failure to comply was reckless, at best. Accordingly, the Court finds that the three year statute of limitations of 29 U.S.C. § 255(a) is applicable to Plaintiffs' FLSA claims.

### E. Joinder Motions

■ This action was filed on September 18, 1998. On October 16, 1998, the Court set a deadline of November 30, 1998 for the joinder of additional parties. On November 5, 1998, Plaintiffs filed a motion requesting that the Court issue an order authorizing notice to all potential class members employed at Perdue's Salisbury, Accomac, and Georgetown[12] processing plants. The Court granted that motion on December 30, 1998, and also extended the deadline for joinder of additional parties to March 5, 1999. That deadline was later moved to April 1, 1999. After the April 1 deadline, the Court continued to receive additional requests to extend the deadline to allow additional Plaintiffs to join the action: three in April, one in May, one in July, and most recently, one in January of this year. With the exception of that last motion that is still pending, these motions were all granted.

More than one hundred chicken catchers from Perdue's Salsibury, Accomac, and Georgetown facilities have now joined this action. The parties have conducted extensive discovery regarding the functioning of live-haul crews for these three plants and summary judgment motions have been fully briefed relying on the factual record

developed through that discovery. As is apparent from the above discussion, the issues raised in the motions were very fact intensive.

Plaintiffs have now moved to expand the action to include individuals working in the live-haul crews that catch for Perdue's Milford, Delaware facility. In order to facilitate the entry of those individuals into the case, Plaintiffs ask that the Court set in motion the same notice procedures ordered on December 30, 1999 for the Salisbury, Accomac, and Georgetown facilities, i.e., distribution of notice by Perdue to all current employees and the provision by Perdue to Plaintiff's counsel of a list of all former employees within 20 days. Plaintiffs then ask that the Court allow 75 days for catchers from the Milford plant to file Notice of Consent forms to join the action.

The Court will deny this motion. In so doing, the Court is aware that the result will most likely be a separate suit brought by the catchers at the Milford facility that will involve issues nearly identical to those raised in the instant action. This duplication will undoubtedly entail certain inefficiencies.

Allowing this suit to expand to include the Milford employees, however, also raises significant concerns. With the issuance of this Memorandum and Order, the liability issues as to the Salisbury, Accomac, and Georgetown plants will have been resolved. All that remains as to the current Plaintiffs is the task of determining the amount of overtime pay to which each individual is entitled. The liability issue as to the Milford plant is not ready for resolution, and will not be until at least some minimal discovery is completed. Plaintiffs argue that the declarations that they attach to the motion for joinder establish conclusively that the Milford catchers are similarly situated to the catchers from the other three plants. While it seems likely that

12. The initial complaint did not include allegations related to the Georgetown plant. On April 23, 1999, Plaintiff moved to amended the Complaint to expand the action to include

chicken catchers for the Georgetown plant. The Court granted that Motion on May 28, 1999.

this conclusion is correct, based on the facts presented in the declarations, the Court is unwilling to make that finding based upon the limited record now before it.[13]

The Court also notes that the process of notification and filing of consent forms is likely to take some time. While Plaintiffs propose a period of 75 days for all of this to occur, the experience with the notification and filing process at the other three plants leads the Court to question how realistic that deadline will prove to be. To delay beginning the next phase the litigation until this process is complete, whenever that might be, would not serve the best interests of the current Plaintiffs. If the Court were to allow the Salisbury, Accomac and Georgetown Plaintiffs to proceed to the next phase without waiting for the joinder of and determination of liability as to all Milford Plaintiffs, then the advantages of joinder are called into question—the litigation would be proceeding on two separate tracks, regardless.[14]

The Court will grant the motion to extend time to allow Oliver Hazzard to join in this action. Hazzard works at the Salisbury plant and states that he was never notified of the lawsuit by his crew leader. According to Hazzard, he did not learn of the suit until December 18, 1999, when he was told about the case by a worker on a different crew. There is no evidence of any lack of diligence on Hazzard's part or prejudice to Perdue in his late joinder.

## III. CONCLUSION

For the above stated reasons, the Court will grant Plaintiffs' motion for summary judgment as to liability. The Court finds that Plaintiffs are employees of Defendant Perdue for the purposes of the FLSA and Maryland's Wage and Hour Law and that no exemptions are applicable. The Court also finds that Perdue's continued failure to pay Plaintiff's overtime was, and is, willful. Finally, while the Court will allow Salisbury worker Oliver Hazzard to join in this action, the Court concludes that the addition of Plaintiffs that catch chickens for Perdue's Milford, Delaware plant would not be in the best interests of the current parties or of judicial economy. A separate order consistent with this Memorandum will issue.

### ORDER

In accordance with the foregoing Memorandum and for the reasons stated therein, IT IS this 24th day of February, 2000, by the United States District Court for the District of Maryland, ORDERED:

1. That the Department of Labor's Motion to File Amicus Brief, Paper No. 72, is hereby GRANTED;

---

13. The Court notes that Plaintiffs' declarations themselves reveal some dissimilarities. Milford crew leaders employ their own vans and not Perdue crew cabs. Milford crew leaders appear to have had a relationship with Perdue for a shorter period of time than crew leaders at the other facilities. While neither of these differences are dispositive, in and of themselves, they highlight the need for at least some discovery. One of the recent decisions submitted by Plaintiffs as "supplemental authority," *Herman v. Continental Grain Co.*, stresses the highly fact specific nature of the determination of when the agricultural laborer exemption applies.

14. The parties have brought to the Court's attention the fact that the Court has already allowed one catcher from the Milford plant, Isaiah Daniels, to join in this action. That allowance was granted inadvertently. Daniels filed a motion to extend time to join on May 17, 1999. On May 19, 1999, Perdue filed an opposition to Plaintiffs' motion to extend time which the Court interpreted as an opposition to all then pending motions. Accordingly, the Court granted Daniels' motion to extend on May 28, 1999, without waiting for an opposition directed at that particular motion. Perdue's opposition to the Daniels motion that first highlighted the significance of Daniel's employment at a different plant was filed that same day. Given the Court's decision as to the other Milford Plaintiffs, the Court will sua sponte vacate that portion of its May 28, 1999 order allowing Daniels to join this action. Thus, Daniels will be permitted to join the Milford action, if and when such an action is filed.

2. That Defendant's Motion for Summary Judgment, Paper No. 71, is hereby DENIED;

3. That Plaintiffs' Motion for Summary Judgment on Liability, Paper No. 73, is hereby GRANTED;

4. That Plaintiffs' Motion for Joinder and Notice to Milford Perdue Catchers, Paper No. 79, is hereby DENIED;

5. That Plaintiffs' Motion to Join Oliver Hazzard, Paper No. 82, is GRANTED;

6. That the portion of this Court's order dated May 28, 1999, granting Plaintiff Isaiah Daniels' motion to extend time, Paper No. 56, is VACATED and Plaintiff Daniels is DISMISSED, without prejudice, from this action;

7. That the parties shall submit a joint schedule for the damages phase of this litigation within 21 days of the date of this Order; and

8. That the Clerk of the Court shall mail or transmit copies of the foregoing Memorandum and this Order to all counsel of record.