Alexis HERMAN, Secretary of
Labor U.S. Department of
Labor Plaintiff,

v.

MID–ATLANTIC INSTALLATION
SERVICES, INC., et al.
Defendants.

Civil Action No. S–97–4238.

United States District Court,
D. Maryland.

July 27, 2000.

Alfred J. Fisher, Jr., Office of the Regional Solicitor Region III, Philadelphia, PA, Linda M. Henry, U S Department of Labor GA, Philadelphia, PA, Jacqueline Hershey, U.S. Dept. of Labor, Philadelphia, PA, for Alexis M. Herman.

Douglas M. Topolski, McGuire, Woods, Battle & Boothe, Baltimore, MD, James J. Sullivan, Jr., Pepper Hamilton & Scheetz PH, Wilmington, DE, Robert Ross Niccolini, McGuire Woods LLP, Baltimore, MD, for Mid–Atlantic Installation Services, Inc.

James J. Sullivan, Jr., Pepper Hamilton & Scheetz PH, Wilmington, DE, George A. Voegele, Jr., Klett, Lieber, et al, Philadelphia, PA, Stephen C. Trevisan, Klett Lieber Rooney & Schorling PH, Philadelphia, PA, for Comcast Cablevision of Maryland, L.P., Comcast Cablevision of Harford County, Inc.

Douglas M. Topolski, McGuire, Woods, Battle & Boothe, Baltimore, MD, Robert Ross Niccolini, McGuire Woods LLP, Baltimore, MD, for M/A Telecommunications, Inc.

## MEMORANDUM OPINION

SMALKIN, District Judge.

Alexis Herman, the Secretary of Labor, has brought suit against the defendants, cable television providers ("Comcast")[1] and cable installation companies ("MAT")[2], alleging that the individuals MAT utilizes to install Comcast cable systems in customer homes ("Installers") are employees and not independent contractors, and hence are entitled to overtime compensation under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.* The defendants have moved for summary judgment, arguing that under the undisputed facts of the case the Installers are independent contractors. The issues have been well briefed by the parties and no oral hearing is necessary. Local Rule 105.6 (D.Md.). For the reasons that follow, the defendants' motions for summary judgment will be GRANTED.

### BACKGROUND

The essential facts of this case are undisputed. Comcast is in the business of providing cable television programming to residences and businesses. When a customer orders a cable system from Comcast, certain equipment must be installed in the customer's home. Comcast has contracted with MAT to provide (in part) this installation service. MAT in turn contracts with individual Installers to do the actual installation work. MAT is known in the industry as a cable installation "broker."

The contract between Comcast and MAT has strict specifications regarding

---

1. The Comcast defendants are Comcast Cablevision of Maryland, L.P., Comcast Cable of Maryland, Inc., Comcast Cablevision of Harford County, Inc., Comcast Cablevision of Howard County, Inc., and Comcast Cable Communications, Inc.

2. The MAT defendants are M/A Telecommunications, Inc. and Mid–Atlantic Installations Services, Inc.

technical standards and quality control, the fitness of the Installers (i.e. lack of criminal record or drug use), timeliness of delivery of services and so on. If MAT (or an Installer) fails to perform to these specifications, Comcast can either "backcharge" MAT or demand that the problem be corrected without charge to Comcast. Comcast pays MAT on a piece rate basis.

MAT in turn hires Installers via a written contract. The contract the Installers sign unambiguously states that the relationship between MAT and the individual Installers is that of independent contractor/client and not one of employee/employer. The Installers receive job orders from MAT to install (or repair) the Comcast cable equipment in the. homes of Comcast customers. MAT assigns "routes" to the Installers and imposes upon them (via their contracts) the same requirements of timeliness, expertise and compliance with technical specifications as Comcast imposes upon MAT.

The Installers must provide their own trucks or vans and special tools to install and repair cable systems. When on a job, they must wear MAT-approved uniforms, attach signs to their trucks which state "Contracting for Comcast," and wear ID badges identifying themselves as Comcast contractors associated with MAT. There is a relatively strict time element in the contract; service must be provided within a four-hour window provided to the customer. These latter requirements (uniforms, ID badges and scheduling commitments) are in accordance with various county regulations. At a job site, Installers must use their special tools and knowledge to install or repair cable equipment—work similar to that performed by carpenters and electricians. The Installers are paid on piece rate basis determined by MAT.

Despite the unambiguity of the contract between the Installers and MAT as to the nature of the relationship, the Secretary of Labor has brought this suit on their behalf alleging that they are actually employees of both MAT and Comcast under the FLSA and, therefore, the defendants are liable for overtime wages and other employment benefits. Additional facts relevant to the merits of this claim will be discussed below.

## STANDARD OF REVIEW

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to summary judgment as a matter of law. In *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), the Supreme Court explained that, in considering a motion for summary judgment, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248, 106 S.Ct. 2505. Thus, "the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented." *Id.* at 252, 106 S.Ct. 2505. In undertaking this inquiry, a court must view the facts and the reasonable inferences drawn therefrom "in the light most favorable to the party opposing the motion," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), but the opponent must bring forth admissible evidence upon which a reasonable fact finder could rely. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Ca-*

*trett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

## ANALYSIS

The FLSA provides protection for employees in their working conditions. In doing so, it draws a distinction between employees, whom it covers, and independent contractors, whom it does not. *Heath v. Perdue Farms, Inc.,* 87 F.Supp.2d 452, 456 (D.Md.2000). The threshold liability question in this case, therefore, is whether the Installers are "employees" or independent contractors under the FLSA.

■ The concept of "employment" under the FLSA is extremely broad—broader than the common law definition of employment and even broader than several other federal employment-related statutes, such as the Internal Revenue Code. *See id.; Prince Cable, Inc. v. United States,* 1998 WL 419979, *2 (D.Del. April 9, 1998) (unpublished opinion) (tax code uses common law principles to determine if individual . is employee or contractor). Its breadth stems from the definition of the term "employ" in the statute, *see* 29 U.S.C. § 203(g), and courts' recognition of the remedial nature of the statute. *See Heath,* 87 F.Supp.2d at 456. Accordingly, the labels which parties attach to their relationship are not controlling; even if a contract clearly defines the relationship as one of client/contractor, it may still constitute that of employer/employee for purposes of the FLSA. *See id.*

■ Courts determine whether an individual is an employee or independent contractor by looking at the "economic reality" of the relationship between the individuals and their alleged employers. *Id.* at 457 (citations omitted); *see also Dole v.*

*Amerilink Corp.,* 729 F.Supp. 73, 75 (E.D.Mo.1990). There is a six-factor test used to determine the economic reality of the relationship:

1. The degree of control which the putative "employer" has over the manner in which the work is performed;

2. The opportunities for profit or loss dependent on the managerial skill of the worker;

3. The worker's investment in equipment or material, or his employment of other workers;

4. The degree of skill required for the work;

5. The permanence of the working relationship; and

6. Whether the service rendered is an integral part of the "employer's" business.

*See Heath,* 87 F.Supp.2d at 457; *Dole,* 729 F.Supp. at 76; *Dubois v. Secretary of Defense,* 161 F.3d 2, 1998 WL 610863, *1 (4th Cir.1998) (unpublished opinion). Rather than looking at one particular factor or applying these factors "mechanically," courts look at the totality of the circumstances in applying them. *See Dubois,* at *1; *Dole,* 729 F.Supp. at 76.

### The Case Against MAT

The Court will first apply the six-factor economic reality test to the relationship the Installers have with MAT, as Comcast can only be considered an employer (or joint-employer) if MAT is also one. On a preliminary note, in applying these factors to the facts of this case (and concluding that the Installers are not "employees" of MAT) the Court notes that it is persuaded by the well-reasoned opinion of Judge Gunn in *Dole v. Amerilink Corp., supra.*[3]

---

**3.** MAT points out that *Dole* is "unreviewed" because the Secretary, the plaintiff in *Dole,* chose not to appeal an adverse published decision. Hence, the Secretary's critique of reliance on the case because it is "unreviewed"

In *Dole,* Judge Gunn applied the same six factors to a virtually identical situation and, after a comprehensive application of each factor to the facts, determined that cable installers were contractors and not employees under the FLSA. *See id.* at 76–77. Because the essentially undisputed facts of this case are so similar to those in *Dole* and the reasoning therein so persuasive, this Court concludes that the same outcome is warranted.

The Court also finds persuasive, though not, of course, binding, the reasoning and holding in a recent unpublished decision by the Court of Special Appeals of Maryland, adjudicating a contract dispute between one of the Installers involved in this case, Anthony Luna, and MAT. *See Luna v. Mid/Atlantic Telecommunications, Inc.,* No. 0599 (Md. Ct. Spec.App. June 7, 2000) (slip opinion). In that case, Mr. Luna had sued MAT for breach of contract stemming from MAT's requirement that he wear a uniform over his objection. *See id.* at 6. In affirming a grant of summary judgment for MAT, the Court of Special Appeals carefully reviewed the relationship between Luna and MAT and concluded that it was one of client/independent contractor and not one of employer/employee. *See id.* at 11–14. While that conclusion is obviously not binding on this Court for several reasons (most importantly, because it applied Maryland common law principles of employment and not the FLSA's broadly expansive definition), the reasoning and decision therein, based as they are on the same parties and a substantially similar legal question, have a persuasive effect on this Court's resolution of this matter under the applicable six-factor test in FLSA cases.

■ With the above case law in mind, the Court turns to an application of the

"economic reality factors" to the facts of this case:

### 1. *Control*

The Secretary argues that several aspects of the parties' working relationship indicate that MAT exercises *de facto* control over the Installers: the latter must install the cable systems in accordance with MAT's and Comcast's strict specifications; MAT "back-charges" Installers for failure to meet installation specifications and other MAT policies; Installers are required to wear uniforms and ID badges associating themselves with MAT and Comcast; they must get pre-approval before they perform "field assists" (special work assignments requested by the customer); MAT performs background checks and drug tests on Installer applicants; they receive their routes from MAT and have little opportunity to alter them; and they must check in regularly with MAT's dispatcher.

On their face, these facts appear to demonstrate substantial control by MAT. Upon careful review, however, it is apparent that MAT *does not* exercise the *type* of control necessary to label the Installers "employees." *See Dole,* 729 F.Supp. at 76 (discussing the "control" the putative employer had over the installers and concluding that it was insufficient to make them employees). First, and most importantly, requiring the Installers to meet MAT's and Comcast's installation specifications is entirely consistent with the standard role of a contractor who is hired to perform highly technical duties. It is in the nature of a contract that the contractor promises to deliver the performance bargained for by the client. For example, a builder will build a building according to the specifications of an architect. That does not make the builder an employee. A painter will

is misleading and a bit disingenuous. *See* Sec's Mem. at 30.

paint a house the colors dictated by the homeowner. That does not make the painter an employee. In short, requiring a contractor to meet the client's technical specifications is not the type of "control" which bestows "employee" status on the contractor. *See id.* ("[T]his [quality control] constraint inheres in any subcontractor relationship and the Court does not find this isolated instance of control dispositive.").

Similarly, "back-charging"—that is, deducting money from payments for failure to meet specifications—does not indicate "control" in the sense of an employer's control over an employee. It is common in contractual relationships for the client to withhold money if work is not done correctly. For example, in most construction contracts a certain percentage is generally withheld from each payment pending complete performance of the contract and satisfactory completion of the "punch list" items. If complete and acceptable performance is not made, the full contract amount is not paid. Similarly, in this case MAT has the right to charge its contractors if they fail to meet the contract specifications. Such a right does not implicate "control" or "employee" status. In fact, the Secretary has been unable to point to a case in which *employees* are generally docked pay as a result of their mistakes. Based on this record the Court is satisfied that this arrangement is consistent with a contractor/client relationship.

Requiring Installers to wear uniforms and ID badges identifying themselves with MAT and Comcast does not make them employees. First, all parties agree that local county regulations require the ID badges and uniform identifications. As such, it is impossible to conclude that *MAT* is controlling the Installers. Because the law requires it, Installers would have to wear the same identifying information regardless of whether they are employees or independent contractors under FLSA's criteria. Moreover, even if the county regulations did not mandate it, the Court would conclude that MAT's identification requirement would not transform the Installers into employees, because the requirement does not affect the economic reality of the relationship. It does not affect the Installers' economic dependence on or independence from MAT in any way, but merely allows consumers to be assured of their *bona fides.*

MAT's requirement that the Installers get prior approval before they perform additional work for a customer connotes a typical contractor/client relationship and not one of employee/employer. Because the Installers are paid by the task, it is natural that MAT would want to pre-approve additional work orders before committing themselves financially.

MAT's drug test and background-check policy (which is mandated by its contract with Comcast) is neutral. It denotes neither an employee/employer nor a contractor/client relationship; instead, it is perfectly consistent with both. The installers enter customers' homes. It is only good business sense for Comcast and MAT to attempt to insure that they are fit to do so. Accordingly, MAT is entitled to contract only with people who pass these fitness clearances. Similarly, the requirement that any helpers or sub-contractors hired by the Installers meet the same fitness requirements does not make the Installers employees.

The final alleged indicator of "control" is the fact that MAT assigns the routes that Installers work.[4] MAT also requires the

---

4. While it is true that ultimately MAT determines the Installers' routes, it is uncontroverted that MAT attempts to meet the Installers' requests for specific routes. Moreover,

Installers to regularly report in to the dispatcher. The Court agrees with the Secretary that this close monitoring of progress and location indicates a certain degree of control over the Installers by MAT. It is insufficient in and of itself, however, to transform the relationship between the parties into that of employer/employee. Given the nature of the job and the requirement that customers be serviced inside a four-hour window—a requirement mandated by the contract with Comcast and, more importantly, county regulations—it is natural that MAT would establish procedures to insure that this timeliness requirement is met by its contractors. These procedures stem from the nature of the business and the need to provide reliable service and convenience to the consumers, not the nature of the relationship between MAT and Installers. Accordingly, this factor is not so compelling as to dictate a conclusion that the Installers are MAT's employees.

Other aspects of the relationship between the Installers and MAT, not emphasized by the Secretary, indicate a lack of control by MAT over the Installers. As the Court of Special Appeals recognized in *Luna*, the Installers must assume responsibility for obtaining the proper qualifications, assure compliance with safety standards, perform their jobs free from all defects, pay all required taxes, and train and supervise their own helpers. *See Luna*, *supra*, at 11. The court called these aspects of the relationship "classic

factors that establish the absence of control by [MAT]." *Id.* Moreover, the Installers can hire whomever they want as helpers or sub-contractors, subject only to the fitness standards discussed above.[5]

Taking all of these factors into consideration, this Court concludes, as the *Dole* court and the Court of Special Appeals did, that MAT does not exercise the type or level of control necessary to characterize the relationship between the Installers and MAT as one of employee/employer under any conceivably relevant test.

2. *Opportunity for Profit or Loss Dependent on Managerial Skill*

This factor indicates contractor status, but it does not overwhelmingly tip the scales in that direction. On the one hand, it is well-established that Installers can control their own profits and losses by agreeing to work more or fewer hours and, more importantly, by improving their technique so that they can service more customers faster. One Installer testified that there were certain installers who "did good work,...large amounts of work" who "could make a very large sum of money." Dreer Depo. at 60.[6] The ability to generate more money based on skill and hard work denotes independent contractor status. *See Dole*, 729 F.Supp. at 76–77.

On the other hand, MAT essentially controls the routes and sets the per-job pay rate. The Installers cannot unilaterally

---

one of the Installers testified that it was common for them to swap routes among themselves at breakfast and thereafter inform MAT who would be servicing which customer, presenting MAT with a *fait accompli* as to the actual routes. *See, e.g.,* Dreer Depo. at 164. Employees do not commonly enjoy such a degree of freedom.

5. The fact that many Installers choose not to hire helpers does not mean that they are controlled by MAT. It is their *right* to do so

which is relevant. The Installers' independent decision whether to hire helpers or not indicates their financial autonomy and the necessity for a certain amount of management skill—one of the factors indicative of independent contractor status.

6. According to Installer Dreer, these "favorite" installers generally have their choice of routes. *See* Dreer Depo. at 60.

control how many customers they will service on a given day or how much they will be paid for each job. Accordingly, it is impossible to say that the Installers are *solely* in control of their profits or losses. But, they are no more in control than are any other entities, including "typical" contractors, whose income derives from how much work someone else wants to give them and at what rate they will be paid. Because the Installer's opportunity for profit or loss is curtailed to only that limited extent by dependence on MAT, this factor does not strongly tip the scales one way or the other. *See Dole*, 729 F.Supp. at 76 (finding that because the installers had a self-determined opportunity for profit or loss, this factor indicates "contractor" status).

### 3. *Investment in Equipment and Employment of Others*

This factor weighs strongly in favor of the Installers being considered contractors. The Installers are responsible for providing their own truck or van and specialty tools (which they may acquire from MAT). They also pay their own insurance premiums and taxes as self-employed contractors. Because these costs are considerable, especially considering the expense of a truck or van, and are of a type not normally borne by employees, this factor indicates that the Installers are contractors.[7] *See id.* at 76–77 (finding that costs of tools, vehicle, and insurance constitute a significant investment and contrast sharply

with the experience of a typical clerical employee, who finds all of his office supplies waiting for him at his work-station, freely provided by the employer).

As discussed above, the right of the Installers to hire helpers or sub-contractors is also indicative of their status as independent contractors.[8]

### 4. *The Degree of Skill Required*

While the Secretary has attempted to downplay the skill level required to install and service cable systems, there is no question that it is a skilled trade. The skills involved in cable installation and service are akin to carpentry and electrical work. Traditionally, carpenters, construction workers, electricians and similarly skilled tradesmen are considered independent contractors. *See* "Labor and Labor Relations," 48A Am.Jur.2d, § 3836 (1994). Because of the similarity between cable installation and these trades, this factor indicates a finding that the Installers are independent contractors. *See Dole*, 729 F.Supp. at 77 (installers possess special skills of carpenters and electricians, which is indicative of contractor status).[9]

### 5. *The Permanence of the Working Relationship*

While several Installers have been with MAT for over a year, several have not. Some Installers work only part time, to supplement their principal incomes, while others make this their career. While it is

---

**7.** The Secretary attempts to show a minimal investment by focusing only on the costs of the specialty tools which the Installers must possess. Her argument is without merit, because it blatantly ignores the substantial costs of a vehicle (even if the Installer leases one), taxes, and insurance.

**8.** *See* Note 5, *supra.*

**9.** The skills involved in cable installation stand in stark contrast to chicken catching,

the focus of Judge Nickerson's opinion in *Heath v. Perdue Farms, Inc.*, 87 F.Supp.2d 452 (D.Md.2000), the principal case upon which the Secretary relies. Without going into the truly gory details involved, suffice it to say that chicken catching is unskilled labor; hence *Heath's* outcome has about as much to do with this case as chicken feathers have to do with chicken salad.

certainly possible for Installers to establish a long-term relationship with MAT, implying employment, it is not necessarily the norm, nor is it required. Accordingly, this factor is neutral.

The parties devote a substantial portion of their briefs to arguing over whether the Installers can work for more than one cable installation broker. (This is the only issue on which there is any significant dispute of fact.) The language in the contract between MAT and the Installers is clear that the Installers can work for others. Despite that, the Secretary submits that MAT does not allow the Installers to work for competitors and disciplines them if they do.

 The Secretary's flat statement that it was *"prohibited* by MAT and Com-

cast," Sec's Mem. at 26 (emphasis added), for the Installers to work elsewhere is not supported by admissible evidence sufficient to generate a triable dispute.[10] What is clear, however, taking the evidence in the light most favorable to the Secretary, is that working for competitors was discouraged. What is equally clear from the deposition testimony is that there was no real incentive or time to work for competitors. Because MAT generally had full assignments for the Installers, there was no reason to switch from one broker to another or to work for more than one at any given time. Accordingly, although MAT's discouragement of working for competitors contributed to a more permanent working relationship between MAT and the Installers, and otherwise generally strengthened the economic dependence of the Installers

10. The Secretary cites several witnesses' depositions to support this statement. *See* Sec's Mem. at 26. Not all of the cited testimony stands for this proposition, however. In fact, some of the witnesses cited by the Secretary testified exactly contrary to her factual averment. Messrs. Holcomb, Anders, and Schreyer stated flatly that Installers *could* work for others. The other deponents essentially stated that while it was discouraged, they knew they had the right to work for others. There is also evidence that Comcast disliked Installers working for more than one broker handling Comcast accounts in the same region—in other words, Comcast wanted to limit overlap among the Installers.

There are only two pieces of evidence regarding actions taken by MAT against an Installer for working for a competitor, and neither is sufficient to create a triable issue of fact because neither is admissible. *See* Fed. R.Civ.P. 56(e); *Wilson v. Clancy*, 747 F.Supp. 1154, 1158 (D.Md.1990) (opponent of motion must present admissible evidence to defeat summary judgment), *aff'd* 940 F.2d 654 (4th Cir.1991). Installer Dreer testified about an individual named "Tim" who, according to the "rumor mill," may have been fired by MAT because he was also working for Jones Cable. *See* Dreer Depo. at 176–77, 256. The Court will not credit such speculative hearsay as competent evidence. The other evidence is in the form of a handwritten message dated

November 23, 1993, from Joe Walker of MAT to Mark Markiewicz of Comcast stating that Gordon Gierezak was fired for "violating the no competition claus [sic] of the the [sic] contract." Sec's Ex. 60. The Secretary has produced no other evidence and devotes no time in her brief explaining the circumstances surrounding the firing, the subsequent note, who Mr. Walker or Mr. Gierezak are, what Gierezak's contract with MAT provided, or even whether he was an Installer. Therefore, the Secretary has failed to establish a proper foundation to admit the note as a statement by a party-opponent pursuant to Fed.R.Evid. 801(d)(2) or as a business record pursuant to Fed.R.Evid. 803(6). Because the note is inadmissible, it cannot be consider as competent evidence sufficient to defeat a motion for summary judgment. *See Wilson, supra.*

Even if such evidence were admissible, it would not change this Court's conclusion as to whether the Installers are contractors or employees. It is not uncommon to have non-compete clauses in contracts, and while a restraint on free competition is somewhat indicative of economic dependence on MAT, it does not outweigh the other substantial factors showing the Installers' economic independence. Because of that independence, the Installers must be considered contractors.

on MAT, it is not enough, by itself or in combination with other factors, to cause the Installers to be classified as MAT's "employees."

### 6. *Cable Installation as an Integral Part of MAT's Business*

MAT was in the business of brokering cable installation to cable providers. The Installers were therefore integral to MAT's business. However, one factor standing alone does not tip the balance towards a finding of "employment." *See Dole,* 729 F.Supp. at 77.

*Conclusion*

In conclusion, taking all of these factors together, the Court concludes that the Installers are independent contractors. Other than assigning routes, MAT does not exert significant control over them; instead, the Installers are personally responsible for providing their trucks and tools, for the quality of their work, and for adherence to contract specifications. Through skill and hard work, they can substantially increase their earnings. Their labor is skilled and is of the type usually performed by contractors. And, as noted, they must make a significant capital investment in their business, including the purchase or lease of a vehicle and special tools. As the courts in both *Dole* and *Luna* found, these are the hallmarks of an independent contractor, whether adjudged under common law or FLSA criteria of what an "employee" is.

### *The Case Against Comcast*

Because MAT cannot be considered the Installers' employer, neither can Comcast, whose only relationship with them is via its contract with MAT. Moreover, even if this Court were to conclude that the Installers were employees of MAT, it would not so find vis-a-vis Comcast. The Secretary's arguments imputing employer liability to Comcast are devoid of merit. She argues that because Comcast set technical specifications which had to be met, insisted that Installers be fit to enter customers homes, and mandated that the Installers show up within a four-hour window, Comcast "controlled" the Installers. The Court notes that taking this argument to its logical conclusion, a case could be made that the *customer* is an employer of the Installers. After all, the customer also expects the Installer to show up within the four hour window, to be fit to enter the house, and to install the cable service in a quality manner. In short, neither the customer nor Comcast can possibly be considered the Installers' employer.

### CONCLUSION

For the aforesaid reasons, an Order will separately issued GRANTING the defendants' motions for summary judgment.