Giovanni ("Henry") MONTOYA, et al.

v.

S.C.C.P. PAINTING CONTRACTORS, INC., et al.

Civil No. CCB–07–455.

United States District Court, D. Maryland.

Dec. 16, 2008.

Anne Elizabeth Langford, David J. Cynamon, Pillsbury Winthrop Shaw Pittman LLP, Laura Elena Varela, Susan E. Huhta, Washington Lawyers Committee for Civil Rights and Urban AFFA, Washington, DC, for Giovanni ("Henry") Montoya, et al.

G. Randall Whittenberger, Miles and Stockbridge, Frederick, MD, for S.C.C.P. Painting Contractors, Inc., et al.

## MEMORANDUM

CATHERINE C. BLAKE, District Judge.

Now pending before this court are two motions for leave to file amended pleadings. The named plaintiffs, on behalf of themselves and the conditionally-certified plaintiff class (together "the plaintiffs"), seek leave to file an amended summons and complaint to correct a misnomer.[1] Defendants S.C.C.P. Painting Contractors ("SCCP") and Ascenzo Sulmonte (together "the defendants") seek leave to amend their answer to add two defenses. Also pending before this court is the plaintiffs' motion for partial summary judgment on (1) the issue of whether they meet the definition of non-exempt employees under the Fair Labor Standards Act ("FLSA") and thus are entitled to its overtime protections, and (2) the defendants' liability for failure to pay overtime wages in violation of the FLSA. The parties have fully briefed the issues and no hearing is necessary. For the reasons articulated below, the court will grant the plaintiffs' motions for leave and partial summary judgment and will deny the defendants' motion for leave.

### Background

SCCP is a Maryland corporation that for the past four or five years has primarily provided painting services. Defendant Ascenzo Sulmonte ("Mr.Sulmonte") is the founder, sole owner, and president of the corporation. The plaintiffs, all of whom are of Hispanic origin and native Spanish speakers, worked for SCCP as painters at some point since February 21, 2004. The plaintiffs were hired by Rene Aguilera ("Mr.Aguilera"), who is responsible for much of SCCP's day-to-day operations and hires all of its workers.

It is undisputed that SCCP did not require the plaintiffs to complete income tax-related paperwork, that SCCP never withheld taxes or made other payroll withholdings from their paychecks, and that SCCP never issued them IRS W–2 (employee compensation) or 1099 (non-employee compensation) forms. According to the defendants, when Mr. Aguilera hired the plaintiffs, they negotiated to "be[ ] responsible for their own taxes due to their choice not to supply paperwork for such tax and employment purposes, and ... wanted to handle payments to them on a self-employed basis expecting to get a full dollar amount for the hours without [SCCP] touching their money for tax purposes." (Defs.' Opp. to Summ. J., Ex. A at 1.) The defendants further contend that they could not issue proper tax forms because the plaintiffs did not provide them with the requisite information such as full names, addresses, or social security numbers.

During their tenure with SCCP, the plaintiffs worked at various job sites in Virginia, Maryland, and the District of Columbia, where they claim they often worked more than 40 hours per week but were not compensated at an overtime rate. It is undisputed that individuals who worked over 40 hours in a given workweek were not paid at one-and-a-half times their regular rate for the hours worked over 40. SCCP time sheets indicate that its painters frequently worked more than 40 hours per week and were compensated for all hours at their regular wage rate. (*See* Pls. Summ. J. Mem., Ex. 5.)

---

1. In their initial pleadings, the plaintiffs identified Giovanni Sulmonte as a defendant in this action. As discussed below, the plaintiffs will be granted leave to file an amended summons and complaint changing all references from Giovanni Sulmonte to Ascenzo Sulmonte. In light of this change, the court will reference the individual defendant in this action as Ascenzo Sulmonte.

On February 21, 2007, the named plaintiffs, on behalf of themselves and a class of similarly situated SCCP painters, filed a complaint alleging, *inter alia*, that the defendants breached oral employment contracts by failing to fully compensate them for services rendered and failed to pay them overtime pay in violation of the Fair Labor Standards Act ("FLSA"). On February 26, 2008, the court granted the named plaintiffs' motion for class certification. To date, 20 individuals, including the named plaintiffs, are part of the plaintiff class. On May 14, 2007, the defendants filed an answer to the complaint and on August 4, 2008, filed a motion seeking leave to amend the answer to add two defenses. On August 11, 2008, the plaintiffs filed a motion for leave to file an amended summons and complaint changing all references from "Giovanni Sulmonte" to "Ascenzo Sulmonte." The plaintiffs filed their motion for partial summary judgment on August 29, 2008.

## A. Plaintiffs' Motion for Leave to File Amended Summons and Complaint

The plaintiffs seek leave to file an amended summons and complaint to correct all references from Giovanni (a.k.a."John") Sulmonte to Ascenzo (a.k.a."John") Sulmonte. Giovanni Sulmonte is Ascenzo Sulmonte's father. The misnomer resulted, according to the plaintiffs, from the fact that the defendant is commonly known by the name "John," which is not his given name. In trying to identify the intended defendant by his given name, the plaintiffs erroneously identified him by his father's name. The defendants oppose the motion, contending that at this stage of the litigation amending the complaint will result in injustice by placing Ascenzo Sulmonte's "individual rights, interests, welfare, and property ... at risk, [and] requiring careful individual review of the claims by himself and his chosen counsel." (Defs.' Opp. to Pls.' Mot. for Leave at 3.)

■ Federal Rule of Civil Procedure 15(a)(2) provides that courts should freely allow parties leave to amend their pleadings "when justice so requires." The Fourth Circuit has stated that "[u]nder modern practice, if the right party is before the court, although under a wrong name, an amendment to cure a misnomer of parties will be allowed." *United States v. A.H. Fischer Lumber Co.*, 162 F.2d 872, 874 (4th Cir.1947) (internal quotation marks and citation omitted).

The defendants contend that Azcenzo Sulmonte is not involved in the litigation and was not individually served in this action. According to plaintiffs, however, Ascenzo Sulmonte has been involved in this case by, *inter alia*, being deposed, appearing at court proceedings, and signing interrogatory responses. During Ascenzo Sulmonte's deposition, he testified that he is the sole officer of SCCP and that he is the founder and president of the business. Moreover, it is undisputed that service of process was made on an adult, "Mrs. Sulmonte, wife," at Ascenzo Sulmonte's home address in Thurmont, Maryland. Giovanni Sulmonte, on the other hand, has made no appearances nor actively participated in the litigation, and there has been no suggestion by either party that he is involved with SCCP.

■ Considering that the plaintiffs sued the defendants for alleged offenses occurring while they worked for SCCP, a company founded and run solely by Ascenzo Sulmonte; that the plaintiffs referred in their complaint to the individual defendant as "an officer of S.C.C.P." and as being "highly involved in and/or responsible for overseeing the running of S.C.C.P." (Compl.¶ 13); that the summons and complaint were served at Ascenzo Sulmonte's home address; and that Ascenzo Sul-

monte, not Giovanni Sulmonte, has been involved in discovery and other matters involving this litigation, the court is convinced that the right party, Ascenzo Sulmonte, is before the court. It is clear that the plaintiffs intended to sue Ascenzo Sulmonte and that no one has been misled by the misnomer of parties or will be prejudiced as a result. *See Morrel v. Nationwide Mut. Fire Ins. Co.*, 188 F.3d 218, 224–25 (4th Cir.1999) (concluding failure to include "Inc." in title of defendant corporation misled no one, noting that the pleading referred to specific corporation project and ensuing arbitration) (citing *Barsten v. Dep't of Interior*, 896 F.2d 422, 423 (9th Cir.1990) (technical misnaming of defendant insignificant where complaint and accompanying documents make defendant's identity clear)). The court, therefore, will grant the plaintiffs' motion for leave to file an amended summons and complaint. The court also will dismiss Giovanni Sulmonte from this case.

## B. Defendants' Motion for Leave to Amend Answer

Defendants seek leave to amend their answer to include two additional defenses:

### ELEVENTH DEFENSE

If the Court were to find that Plaintiffs are employees, Defendant [SCCP] is due restitution from Plaintiffs for mistaken overpayments to Plaintiffs constituting amounts it would have withheld and will thereby need to pay over to appropriate governmental authorities, to the extent the Plaintiffs failed to pay their taxes as independent contractors, which amounts must be offset against any amount which may be awarded in favor of Plaintiffs, under the doctrines of setoff and recoupment.

### TWELFTH DEFENSE

[Seven] Plaintiffs ... materially breached their verbal agreements with Defendant [SCCP], which caused consequential and foreseeable damages to Defendant [SCCP], which amounts must be offset against any amounts which may be awarded in favor of Plaintiffs, under the doctrines of setoff and recoupment.

(Defs.' Mot. for Leave, Ex. A at 1–2.)

■ The defendants describe both defenses as falling under the doctrines of setoff and recoupment.

"[R]ecoupment" means a diminution or a complete counterbalancing of the adversary's claim based upon circumstances arising out of the same transaction on which the adversary's claim is based; "setoff" means a diminution or a complete counterbalancing of the adversary's claim based upon circumstances arising out of a transaction other than that on which the adversary's claim is based; and "counterclaim" means the assertion of a right to have an affirmative judgment against the adversary based upon a setoff or a recoupment.

*Imbesi v. Carpenter Realty Corp.*, 357 Md. 375, 744 A.2d 549, 552 (2000). Under Maryland law, recoupment may be raised as a defense rather than an affirmative counterclaim, *see Smith v. Smith*, 79 Md.App. 650, 558 A.2d 798, 801 n. 2 (1989), while setoff must be pled as a counterclaim, *see E.J. Smith Construction Co. v. Burton*, 262 Md. 62, 277 A.2d 84, 87 (1971). The plaintiffs contend that while the defendants have styled their proposed amendments as defenses, they are in fact counterclaims for setoff and must be pled as such in compliance with the requirements of the Federal Rules of Civil Procedure. The defendants argue that the amendments are properly pled as recoupment defenses and, therefore, need not be specially pled as counterclaims.

### i. Eleventh Defense

■ The plaintiffs claim that they are employees as defined under the FLSA and, as such, are entitled to overtime wages, which SCCP failed to pay. The defendants now seek "restitution" for "mistaken overpayments" of wages that SCCP should have withheld for tax purposes, in the event the plaintiffs are deemed to be employees and failed to pay taxes as independent contractors. Whether called recoupment or setoff, a claim for such payments would be futile, as plaintiffs do not owe defendants monies which the defendants may have been obligated to pay but did not. Any necessary accounting for taxes that may be owed on any recovery can be done at the time of judgment.

Nor would it be in the interest of justice to allow the defendants to amend their answer in such a way. *See* Fed.R.Civ.P. 15(a)(2) ("The court should freely give leave [to amend a pleading] when justice so requires.") The defendants seek to recoup "mistaken overpayments" for unpaid taxes that they knew would not be paid. It is undisputed that SCCP did not require its workers to fill out proper tax forms and, despite claiming they were independent contractors, never sent them the appropriate 1099 tax forms. In light of their past conduct, the defendants' present concern about complying with the "appropriate governmental authorities" seems disingenuous at best. Moreover, the record demonstrates that SCCP has no organized bookkeeping system; at certain, seemingly arbitrary, intervals SCCP disposed of papers listing its workers' hours and wages. Thus, even assuming the defendants have some legal justification for seeking restitution for overpayments in the form of unpaid taxes, it is unclear how the defendants would go about calculating any alleged overpayments. Lastly, the defendants offer no explanation for the delay in adding this defense. The plaintiffs' status under the FLSA has been at issue since the inception of the litigation, and SCCP's failure to send its workers the proper tax forms belies any suggestion that the defendants did not know whether their workers were filing tax returns. Considering these factors, the equities do not favor permitting the defendants leave to amend their answer.

### ii. Twelfth Defense

■ In their proposed twelfth defense, the defendants seek recoupment for alleged breaches of oral agreements by seven plaintiffs. A recoupment is allowed as a defense in an action for breach of contract and the defendant is entitled to "a recoupment to the extent of his damages which were the certain result of the breach." *Smith*, 558 A.2d at 805 (quoting *Hammaker v. Schleigh*, 157 Md. 652, 147 A. 790, 797 (1929)). Here, however, the defendants provide no indication that their allegations of breached agreements flow from the same transactions underlying the plaintiffs' breach of contract claims. The defendants do not identify the agreements at issue, the breaching conduct, or the resultant damages. Standing alone, then, the defendants' breach of agreement allegations are not a recoupment defense, but at best a counterclaim that should have been pled as such.

Even assuming the defendants had properly pled this defense as a counterclaim for breach of contract, however, the claim is too vague to survive a motion to dismiss. The defendants merely recite the elements of a breach of contract claim by alleging that seven plaintiffs breached agreements that resulted in foreseeable damages. *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 1964–65, 167 L.Ed.2d 929 (2007) (holding that to survive a Rule 12(b)(6) motion to dismiss, "a plaintiff's obligation to provide

the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do") (internal citations, quotation marks and alteration omitted). The court, therefore, will deny the defendants' motion for leave to amend their answer. *See United States ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 376 (4th Cir.2008) (noting that while leave to amend motions "should be granted liberally" under Rule 15, such motions may be denied where the proposed amendment would be futile, including where it does not properly state a claim under Rule 12(b)(6)).

## C. Plaintiffs' Motion for Summary Judgment

The plaintiffs seek summary judgment on the questions of whether they are covered employees under the FLSA and, thus, are entitled to overtime wages, and whether the defendants are liable for their failure to pay these wages. The defendants maintains that material questions of fact exist as to whether the plaintiffs are self-employed workers not entitled to FLSA protections.

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The Supreme Court has clarified this does not mean that any factual dispute will defeat the motion: "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*,

477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (emphasis in original).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 525 (4th Cir.2003) (alteration in original) (quoting Fed.R.Civ.P. 56(e)). The court must "view the evidence in the light most favorable to ... the nonmovant, and draw all reasonable inferences in her favor without weighing the evidence or assessing the witness' credibility," *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir.2002), but the court also must abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993), and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).

■ Under the FLSA, employers must pay their covered employees an overtime rate of one and one-half times the employees' regular rate for each hour worked in excess of forty hours per work week. 29 U.S.C. § 207(a)(1). The determination of whether an individual is a covered employee is a legal question under the FLSA, and courts look to the underlying "economic reality" of the relationship between the worker and the putative employer. *Schultz v. Capital Int'l Sec. Inc.*, 466 F.3d 298, 304 (4th Cir.2006). "The focal point is whether the worker is economically dependent on the business to which he renders service or is, as a matter of economic reality, in business for himself." *Id.* (internal quotation marks and alteration omitted).

### i. Plaintiffs' "Independent Contractor" Label

The gravamen of the defendants' argument is that the plaintiffs are not "employees" because they deliberately sought *not* to be in order to hide their undocumented work status. According to the defendants, the plaintiffs individually negotiated to be independent contractors, bargained not to be employees of SCCP, and declined to fill out paperwork to become employees. These negotiations, the defendants contend, evidence that the plaintiffs "recognize they are not permitted to be employees for wages and deliberately steered away from any such work relationship." (Defs.' Opp. to Summ. J. at 16.) [2]

While the defendants question whether the plaintiffs' immigration status prevents them from being lawfully employed under federal law, they stop short of contending that an unlawful work status alone would exempt the plaintiffs from FLSA coverage. Federal courts have consistently recognized that the broad sweep of the FLSA encompasses undocumented workers. *See, e.g., Patel v. Quality Inn S.*, 846 F.2d 700, 705 (11th Cir.1988); *In re Reyes*, 814 F.2d 168, 170 (5th Cir.1987).[3] Instead, the defendants contend that the plaintiffs' "negotiating" to be paid as independent contractors—specifically, by failing to fill out tax forms or request W–2 forms—is definitive proof of their non-employee status. Analyzed outside the context of the underlying immigration issues, the defendants simply argue that because the workers deliberately chose not to be employees, regardless of the work they performed or their relationship with SCCP, the court should not afford them employee protections. As the plaintiffs correctly assert, however, neither the subjective intent of the worker in forming the employment relationship nor the label affixed by the putative employer controls the question whether a worker is an employee under the FLSA.

In *Tony and Susan Alamo Found. v. Sec'y of Labor*, 471 U.S. 290, 105 S.Ct. 1953, 85 L.Ed.2d 278 (1985), the Supreme

---

**2.** The defendants suggest that beyond being impermissible, the plaintiffs' employment was "impossible" under federal law. (Defs.' Opp. to Summ. J. at 5 n. 3) (citing *Hoffman Plastic Compounds, Inc. v. Nat'l Labor Relations Bd.*, 535 U.S. 137, 148, 122 S.Ct. 1275, 152 L.Ed.2d 271 (2002).) A more thorough reading of *Hoffman*, however, reveals that the Supreme Court was referring to the impossibility of an undocumented alien obtaining employment "without some party directly contravening explicit congressional policies." *Id.* at 148, 122 S.Ct. 1275. While the Immigration Reform and Control Act of 1986 ("IRCA") makes the employment of an undocumented worker *unlawful, it does not render* such employment impossible.

**3.** The defendants suggest that the plaintiffs may not be eligible to pursue overtime wages, if they are undocumented workers, under the Supreme Court's holding in *Hoffman*, 535 U.S. at 151, 122 S.Ct. 1275, that illegal aliens were not entitled to backpay. The Court concluded that awarding backpay "unduly trench[ed] upon explicit statutory prohibitions critical to federal immigration policy, as expressed in IRCA." *Id.* Lower courts have distinguished the holding in *Hoffman*, however, from cases 'where, as here, employees sought past wages for work actually performed as opposed to backpay. *See Flores v. Amigon*, 233 F.Supp.2d 462, 463–64 (E.D.N.Y.2002); *Zeng Liu v. Donna Karan Int'l, Inc.*, 207 F.Supp.2d 191, 192 (S.D.N.Y.2002). In *Flores*, the district court noted that the immigration policies at issue in *Hoffman* had less application and might be undermined where a worker sought wages for work already performed. 233 F.Supp.2d at 464 ("If employers know that they will ... be required to pay [undocumented workers] at the same rates as legal workers for work actually performed, there are virtually no incentives left for an employer to hire an undocumented alien in the first instance."); *see also Patel*, 846 F.2d at 704 (noting, in the context of IRCA's underlying policy goals, that "[i]f the FLSA did not cover undocumented aliens, employers wound have an *incentive* to hire them").

Court concluded that, although certain workers considered themselves to be volunteers, as opposed to employees, such views were not dispositive, rather "[t]he test of employment under the [FLSA] is one of 'economic reality.'" *Id.* at 301, 105 S.Ct. 1953. In the Court's view, "the purposes of the Act require that it be applied even to those who would decline its protections . . . . [otherwise] employers might be able to use superior bargaining power to coerce employees . . . to waive their protections under the Act." *Id.* at 302, 105 S.Ct. 1953. Similarly, the mere fact that workers are labeled "independent contractors" does not negate the application of the economic realities test. *See Rutherford Food Corp. v. McComb,* 331 U.S. 722, 729, 67 S.Ct. 1473, 91 L.Ed. 1772 (1947) ("Where the work done, in its essence, follows the usual path of an employee, putting on an 'independent contractor' label does not take the worker from the protection of the [FLSA]."); *see also Real v. Driscoll Strawberry Assocs., Inc.,* 603 F.2d 748, 755 (9th Cir.1979) ("[T]he subjective intent of the parties to a labor contract cannot override the economic realities" of their relationship); *Heath v. Perdue Farms, Inc.,* 87 F.Supp.2d 452, 457 (D.Md.2000) (quoting *Rutherford* for the proposition that "[c]ourts look not to the label, but to the underlying 'economic reality' of the relationship" in determining whether a worker is an independent contractor or employee under the FLSA).

The defendants' attempt to distinguish the present case from *Alamo* is unavailing. They contend that *Alamo* involved the exploitation of "drug addicts" and "derelicts," while these plaintiffs deliberately chose not to be employees by seeking payment as self-employed workers. As discussed above, however, courts look beyond the parties' subjective intent to determine the economic reality of the employment relationship.

### ii. Economic Realities Test

 Courts have established a six-factor test to determine whether a worker is an employee or an independent contractor, based on "economic reality." These factors, derived from *United States v. Silk,* 331 U.S. 704, 67 S.Ct. 1463, 91 L.Ed. 1757 (1947), are:

(1) the degree of control that the putative employer has over the manner in which the work is performed; (2) the worker's opportunities for profit or loss dependent on his managerial skill; (3) the worker's investment in equipment or material, or his employment of other workers; (4) the degree of skill required for the work; (5) the permanence of the working relationship; and (6) the degree to which the services rendered are an integral part of the putative employer's business.

*Schultz,* 466 F.3d at 304–05. No single factor is dispositive, as "the test is designed to capture the economic realities of the relationship between the worker and putative employer." *Id.* at 305.

### 1. Control

The first *Silk* factor is the degree of control that SCCP had over the manner in which the plaintiffs performed their work. Evidence in the record demonstrates the following elements of SCCP's control over the plaintiffs. SCCP directed plaintiffs to particular job sites in Virginia, Maryland, and the District of Columbia, and Mr. Aguilera rotated among these job sites, providing supervision and instruction of foremen and painters. (*See* Pls.' Summ. J. Mem., Ex. 4 at 18–19, 86–90.) Additionally, Mr. Sulmonte provided instructions for the painters in English that Mr. Aguilera would translate orally in Spanish. (*Id.,* Ex. 1 at 36–37, 199–200.) Instructions included which rooms should be painted and in what manner they should be painted

(i.e., which paint to use and how many coats to apply). (*See id.*, Exs. 9, 10.) SCCP set the workers' schedules according to project deadlines; trained inexperienced workers on the job; and required all workers, whether they were paid hourly or on salary, to submit weekly time sheets showing the number of hours worked each day in order to be paid. (*Id.*, Ex. 4 at 71–73, 81.) At all times, SCCP retained the right to discipline or terminate its workers. (*Id.* at 92–93.)

Where putative employers provide specific direction for how workers, particularly low-skilled workers, are to perform their jobs, courts have weighed the control factor in favor of employee status. *Compare Heath*, 87 F.Supp.2d at 457–58 (favoring employee status where employer published a training manual outlining all aspects of the work to be done by chicken catchers, and crew leaders provided continual on-site feedback) *and Schultz*, 466 F.3d at 307 (favoring employee status where a standard operating procedure governed how security guards were to carry out their duties) *with Herman v. Mid-Atlantic Installation Servs., Inc.*, 164 F.Supp.2d 667, 672 (D.Md.2000) (favoring independent contractor status where workers' compliance with technical cable installation specifications was consistent with role of contractor hired to perform highly technical duties). Moreover, the control element may be satisfied where the putative employer sets the plaintiffs' schedules, directs them to particular work sites, requires them to fill out time sheets, and can fire them at will. *See Quinteros v. Sparkle Cleaning, Inc.*, 532 F.Supp.2d 762, 769 (D.Md.2008) (alleging all of these factors).

SCCP contends that it did not exercise control over the painters because they coordinated their work with clients and took direction from the clients, as opposed to SCCP. Even if the painters did coordinate with and take direction from the clients at the job sites, that does not negate the amount of control that SCCP retained over them, which is the relevant inquiry in this analysis. *See Schultz*, 466 F.3d at 305 ("[T]he issue is not the degree of control that an alleged employer has over the manner in which the work is performed in comparison to that of *another employer*. Rather, it is the degree of control that the alleged employer has in comparison to the control exerted by the *worker*.") As discussed above, SCCP exerted a significant degree of control over the manner in which the plaintiffs performed their jobs.

The defendants also contend that SCCP did not control the manner in which the plaintiffs applied paint to the walls, relying on the fact that the painters supplied their own rollers and brushes. There is no doubt that the painters exercised some independent judgment as to how they physically applied paint to the walls, however, as a general rule, they did not control the manner in which they performed their duties. As noted above, SCCP controlled the type of paint used and the number of coats applied, often hired inexperienced painters and trained them on the job, and provided regular feedback on the painters' performance at the job sites. These actions suggest that SCCP exercised a significant amount of control over the manner in which the painters performed their duties, even though the painters were able to make some independent choices. *See id.* at 307 (finding control element satisfied where standard operating procedure dictated most tasks performed by security agents even though they occasionally exercised their own judgment in assessing security threats). Moreover, the plaintiffs' alleged independent responsibilities fall short of what courts have found to indicate a lack of control by the putative employer. *See Herman*, 164 F.Supp.2d at 674 (finding lack of control where workers had to as-

sume responsibility for obtaining proper qualifications; assure compliance with safety standards; pay all required taxes; and hire, train and supervise their own helpers).

### 2. Opportunities for Profit or Loss Dependent on Managerial Skill

SCCP contends that painters had opportunities for profit both because they contracted for higher amounts based on their managerial skill and because they could leave SCCP at any time to earn greater profits elsewhere. The plaintiffs argue that SCCP set their schedules and they had no opportunity to increase their profits by working more efficiently. Where the putative employee's work is, by its nature, time oriented, not project oriented, courts have weighed the second *Silk* factor in favor of employee status. In *Schultz*, for example, the Fourth Circuit reasoned that security agents, who were paid at a set rate for each shift and whose work schedules were dictated by the employer's needs, could not work more efficiently in order to perform additional paid work. 466 F.3d at 308; *see also Heath*, 87 F.Supp.2d at 458 (noting that "because the number of chickens to be caught is limited by Perdue, there is no occasion for extra pay or profit"). In *Herman*, on the other hand, the court emphasized the cable installers' potential for earning greater profits by improving their technique so as to service more customers faster. 164 F.Supp.2d at 674. Here, the painters are more akin to the chicken catchers in *Heath* and the security agents in *Schultz* than to the cable installers in *Herman*. SCCP paid the painters a set salary or hourly rate and dictated their schedules, leaving no opportunity for the painters to earn more by working more efficiently. The fact that some painters earned a higher set rate than others, based on their level of skill, does not change the analysis. Once on the job, each painter was dependent on SCCP's scheduling to earn a living, and SCCP offers no evidence that painters could increase their profits by working more efficiently.

### 3. Investment in Equipment and Employment of Others

It is undisputed that the painters purchased their own paint brushes and rollers and SCCP supplied all other equipment, including paint, drop cloths, paint sprayers, stepladders, extension ladders, painting tape, sandpaper, paper, company t-shirts, and protective equipment such as hard hats and harnesses. (*See* Pls.' Summ. J. Mem., Ex. 4 at 82–83.) In *Heath*, the putative employer provided all major equipment, while the crew leaders, found to be employees, purchased their own computers for bookkeeping and protective gloves and masks for some of the catchers. The court concluded that "[t]he crew leaders' relative lack of capital investment in equipment is perhaps one of the strongest indicators that they are employees and not independent contractors." *Heath*, 87 F.Supp.2d at 458; *see also Herman*, 164 F.Supp.2d at 675 (weighing factor strongly in favor of independent contractor status where installers made considerable investments in their own vehicles, specialty tools, and insurance premiums). While the painters did purchase their own brushes and rollers, this investment was minimal relative to SCCP's capital investment and is highly analogous to the crew leaders' investments in *Heath*. The painters were heavily dependent on SCCP to provide the necessary materials for professional painting. Moreover, while some painters referred new workers to SCCP, it is undisputed that SCCP controlled all personnel decisions, further distinguishing them from the cable installers in *Herman* who had the right to hire helpers or subcontractors. *See Herman*, 164 F.Supp.2d at 674.

### 4. Degree of Skill Required

This factor requires little consideration, as Mr. Sulmonte himself acknowledged that painting "is not a high-skilled job" (*see* Pls. Summ. J. Mem., Ex. 1 at 103), and it is undisputed that SCCP hired painters with no experience. While the defendants suggests that some of the plaintiffs managed other painters and "interface[d] with other superintendents" at the job sites (*see* Defs. Opp. to Summ. J. at 12), this type of generalized managerial skill does not connote independent contractor status. *See Heath,* 87 F.Supp.2d at 458 (noting that while the crew leaders' position required generalized supervision and management skills, that did not render them independent contractors). The defendants' further contention that having to comply with job specifications requires "knowledge of method" (*see* Defs. Opp. to Summ. J. at 12) also fails to change the outcome. Every task, whether skilled or unskilled, requires some degree of knowledge as to how to perform it and an ability to follow directions. *Cf. id.* at 458 (noting that a chicken catcher's ability to become faster with experience "is true of most repetitive tasks, skilled or unskilled").

### 5. Permanence of the Working Relationship

The defendants contend that it hired the plaintiffs temporarily to work on a particular job site.[4] The plaintiffs, however, have submitted evidence in the form of declarations and time sheets indicating that painters worked full time at multiple sites for extended periods of time. (*See* Pls.'

Summ. J. Mem., Exs. 3, 5.) The time sheets cover various two-week time periods extending for approximately one year, and indicate that several of the plaintiffs worked consistently for SCCP throughout those periods. For example, Elmar Reyes worked an average of 49 hours per week, Gustavo Reyes worked an average of 47 hours per week, and Elmo Chavarria worked an average of 41 hours per week.[5] (Pls.' Summ. J. Mem., Ex. 5.) In light of this evidence, this factor weighs in favor of the plaintiffs. *See Quinteros,* 532 F.Supp.2d at 770–71 (relying on check payment stubs as evidence that plaintiffs had an exclusive, continuous relationship with the putative employer).

### 6. Integral Part of the Business

The defendants contend that because the painters were not hired for permanent work and the company could survive without them, they were not an integral part of the business. As discussed above, the plaintiffs have successfully demonstrated that they had some degree of permanence with SCCP. Moreover, this factor does not turn on whether the individual worker was integral to the business; rather, it depends on whether the service the worker performed was integral to the business. In *Heath,* for example, the court concluded that the chicken catchers' function, as opposed to the individual workers, was an integral part of the business of processing chickens. 87 F.Supp.2d at 459. Here, the plaintiffs are painters and the putative employer a painting contractor. Certainly painters' work is as integral to the busi-

---

4. The court notes that in a previous deposition, Mr. Aguilera testified that SCCP began to put painters on salary in order to "have a solid group of men working for [SCCP] and ... make it attractive for the men to stay." (Pls.' Summ. J. Mem., Ex. 4 at 77.)

5. The seven time sheets from which the averages are calculated are dated December 1,

2006; April 6, 2007; July 13, 2007; August 10, 2007; October 5, 2007; October 19, 2007; and November 2, 2007. Older time sheets are unavailable due to SCCP's policy of periodically throwing away time sheets, the latest such purge occurring approximately 10 months prior to the discovery period. (*See* Pls.' Summ. J. Mem., Ex. 1 at 55–56.)

ness of painting as chicken catchers' work is to the business of processing chickens.

Based on the analysis of the *Silk* factors, the court concludes that the plaintiffs were covered FLSA employees when they worked for SCCP. As a result, SCCP is liable to the plaintiffs for any underpayment of overtime wages.[6]

For the foregoing reasons, the court will grant the plaintiffs' motions for leave to file an amended summons and complaint and for partial summary judgment and will deny the defendants' motion for leave to amend their answer. A separate Order follows.

---

**6.** The amounts, if any, due each plaintiff re- main to be determined.