**Boris ROSLOV, et al., Plaintiffs**

v.

**DIRECTV INC., et al., Defendants**

**CASE NO. 4:14–CV–00616 BSM**

United States District Court,
E.D. Arkansas, Western Division.

Signed November 4, 2016

Bradford B. Lear, Todd C. Werts, Lear Werts LLP, Columbia, MO, George A. Hanson, Crystal R. Cook, Stueve Siegel Hanson LLP, Kansas City, MO, Ryan D. O'Dell, Stueve Siegel Hanson LLP, San Diego, CA, for Plaintiffs.

James J. Oh, Littler Mendelson, P.C., Chicago, IL, Jennifer Chierek Znosko, Patricia J. Martin, Littler Mendelson, P.C., St. Louis, MO, Jay A. Ebelhar, Baker, Donelson, Bearman, Caldwell & Berkowitz, Memphis, TN, for Defendants.

## ORDER

Brian S. Miller, UNITED STATES DISTRICT JUDGE

Defendants' motion for summary judgment [Doc. No. 59] against Boris Roslov is granted, and plaintiff Reginald Degraftenreed's claim is dismissed *sua sponte*. The remaining motions are denied as moot.

## I.  BACKGROUND

Defendants DirecTV, Inc. and DirecTV, LLC (collectively "DirecTV") sell and provide digital television and audio program-

ming to consumers via satellite. Pls.'s Resp. Defs.'s Statement Facts Supp. Mot. Degraftenreed ("Degraftenreed Facts") ¶ 1, Doc. No. 81. Plaintiffs Boris Roslov and Reginald Degraftenreed were technicians tasked with installing the DirecTV satellite systems at customer homes and businesses. Roslov and Degraftenreed allege that DirecTV failed to compensate them for their services and failed to pay overtime as required by the Fair Labor Standards Act ("FLSA").

## A. Service Provider Network

When a customer orders DirecTV service, equipment must be installed at the customer's location. To perform some installations, DirecTV contracted with outside companies, referred to as "Service Providers." These Service Providers, in turn, entered into contracts with technicians to perform the installation and service.

The relationship between DirecTV and the Service Providers was governed by a service provider agreement. *See, e.g.*, Doc. No. 84 (agreement filed under seal). The agreement explains that the Service Provider is in the business of installing and maintaining satellite systems, and in exchange for compensation, was responsible for satisfying DirecTV's work orders. The agreement authorizes Service Providers to hire their own employees or independent contractors, and it established standards that Service Provider personnel must follow while fulfilling DirecTV's work orders. *Id.* at 25–27; *see also* Reed Dep. 41:18–42:14, Doc. No. 84 (explaining guidelines); Doc. No. 103 (installation guidelines). To enforce these standards, DirecTV had quality assurance technicians check the Service Providers' work. Reed Dep. 43:1–45:1.

## B. Technicians

If Service Providers hired technicians to complete DirecTV's work orders, the service agreement established hiring and training requirements. *See* Doc. No. 84 at 25. For example, Service Providers could only hire technicians who successfully completed a DirecTV-approved training program and cleared a background check and drug screen through an approved vendor. *Id.*; Reed Dep. 57:6–57:23; Degraftenreed Dep. 108:16–108:6; Roslov Dep. 58:6–58:11. Service Providers had to, at their expense, provide technicians with identification cards, part of which identified the technician as an approved DirecTV installer. Doc. No. 84 at 26. The Service Provider was also required to supervise technicians in proper interactions with customers, uniform and grooming, and other activities. *Id.* at 27.

After a Service Provider hired the technician, DirecTV issued the technician a unique identification number. As DirecTV received orders, it assigned work orders to Service Provider technicians using technician numbers. DirecTV emailed these initial assignments to the local Service Provider, who in turn either reassigned orders to different technicians and reported the change back to DirecTV, or forwarded the orders on to their technicians. Reed Dep. 34:21–35:21; Degraftenreed Dep. 38:16–38:22; Roslov. Dep. 103:25–106:9.

While at a customer's location, technicians were required to stay in contact with a DirecTV call center. Technicians would "status" themselves by notifying the call center as they arrived onsite, to activate receivers, or to report customer issues. Degraftenreed Dep. 42:18–42:21; Roslov. Dep. 117:15–118:10. After work was completed, technicians notified the call center that the order should be closed. *See* Degraftenreed Dep. 164:4–164:25. Technicians did not always status themselves accurately, however, either because of poor cellular reception, a mistake, or some oth-

er reason. *See, e.g.,* Roslov Dep. 168:2–168:12.

Degraftenreed and Roslov are two technicians engaged by Service Providers to complete DirecTV work orders. Degraftenreed was engaged by three Service Providers—Professional Satellite Services ("ProSat"), Wise Owl Communications ("Wise Owl"), and Wave Communications ("Wave")—from early 2009 to July 2010. Roslov was engaged by another Service Provider—Elite Satellite Installations—from mid–2010 to October 2011. Degraftenreed and Roslov did not sue the Service Providers, but only DirecTV.

## C. Reginald Degraftenreed

Degraftenreed learned of an opportunity to work with ProSat through a ProSat technician, Josiah Stricklin. Degraftenreed Dep. 102:5–19. Stricklin contacted Donny Gaskin, a ProSat supervisor, and Stricklin advised Degraftenreed to meet at a storage unit to speak with Gaskin the following morning. *Id.* at 102:19–103:22. Degraftenreed met with Gaskin and signed an independent contractor agreement with ProSat. *Id.* at 60:14–60:25. Gaskin informed Degraftenreed of the background check and drug screen requirement, but Degraftenreed nonetheless began training that day.

Aside from the certification program DirecTV required, Degraftenreed's training mainly consisted of on-the-job training with other ProSat technicians. *See, e.g., id.* 51:6–61:15; 51:20–51:22. On occasion, Degraftenreed received emails about DirecTV services and attended monthly safety training at DirecTV's offices. *Id.* 132–133:24; Reed Dep. 61:2–61:22. When these DirecTV trainings occurred, Degraftenreed received notification by email from a ProSat supervisor. Degraftenreed Dep. 135:3–135:7.

Although Degraftenreed installed DirecTV services, he owned all of his own equipment. He owned his own truck to travel between jobs, his own tools, cell phone to use while working, and his own computer. *Id.* 127:128:9, 191:4–196:4. Some of his tools were issued to Degraftenreed's own limited liability company, Degraftenreed Services. *Id.* 195:25–198:25. Indeed, Degraftenreed used his company's email address to correspond with ProSat while installing DirecTV systems. Although he testified that Degraftenreed Services was not in operation at the time, he still filed a Schedule C with his tax return and took deductions for the expenses incurred while installing DirecTV systems. *Id.* 204:6–205:12.

Degraftenreed's workdays lasted from approximately 6:00am to 7:00pm, though there was variation in the total number of hours he worked each day, including days when he would have no time at all. This time varied for several reasons. For example, he could ask for additional work orders, *id.* 137:6–137:25, or fail to close work orders or turn off his cell phone to avoid receiving assignments, *id.* 156:2–156:6; 164:11–164:25. There were occasions when technicians would not receive work orders, yet ProSat would still have them report to work in case work was found, and Degraftenreed had opportunities to tag-team with other technicians, even though that was against policy. *Id.* 157:11–157:23, 249:9–251:13. Finally, Degraftenreed took days off even if he was told not to. *Id.* 181:20–182:13.

Degraftenreed was not paid hourly, but instead paid by the type of order and only if that order was properly "closed." Degraftenreed Facts ¶¶ 14, 23. For example, he received set pay for a basic installation of a satellite dish and one receiver, but he could receive greater pay for installing additional receivers. Degraftenreed Dep. 54:14–54:21. Since Degraftenreed's pay was not hourly, he was compensated

whether the job took him one hour or three hours. *Id.* 152:8–152:12. Over time, of course, the time spent on these tasks changed as Degraftenreed's skill and experience improved.

Although Degraftenreed documented the hours he actually worked in a notebook, that notebook was destroyed in an automobile accident in June 2009. Degraftenreed Facts ¶ 27. He admits, however, that he never reported his hours to anyone and never submitted time sheets to DirecTV. *Id.* ¶¶ 25–26. He did, however, state to a DirecTV field supervisor that he was not receiving overtime pay, which on at least one occasion, he defined overtime as working on Saturdays. *See* Degraftenreed Dep. 116:18–117:20; 118:4–118:16; *but see id.* 164:11–164:25 (not closing orders was "one way I kept myself from working overtime").

Degraftenreed quit installing DirecTV services in July 2010. He provided no notice to DirecTV, but instead reported that he quit to Stricklin. *Id.* 121:17–121:21. He requests damages in an amount ranging from $0 to $21,037.

### D. Boris Roslov

Roslov learned of an opportunity to install satellite systems from an advertisement on Craigslist. He answered the advertisement by contacting an Elite representative and attended an orientation with other technicians and an Elite supervisor. Roslov Dep. 55:16–55:6; 56:17–57:20. During the orientation, Elite reviewed hiring requirements. At no point during the hiring process did Roslov speak to a DirecTV employee. *Id.* 70:7–70:10.

Elite provided Roslov's training. He participated in a certification program, classroom training at an Elite facility, and on-the-job ride alongs with an experienced technician. *Id.* 65:3–65:11; 23:22–24:24; 66:23–67:3. The training taught him how to manipulate DirecTV's technology, aim satellite dishes, and how to install system components. He also attended weekly tech meetings with technicians and an Elite supervisor, but no one from DirecTV participated. During training, he never spoke to a DirecTV employee. *Id.* 70:3–70:6.

Roslov owned his own tools and equipment, which he identified as a substantial investment. *Id.* 58:20–58:22. He had to purchase an alignment device for over $600, cable, crimping tools, ladders, uniforms, and other supplies. *Id.* 58:22–59:25. He used his own computer, cell phone, and vehicle. *Id.* 60:17–61:11. He also took payroll deductions to use a DirecTV device to status himself on-site. *Id.* 118:25–119:5. Although DirecTV had an approved vendor, Roslov acknowledged that he was not required to purchase equipment from only that vendor. *Id.* 61:12–61:20; 137:10–137:16 ("I purchased [tools] through an approved provider, but there was nobody stopping me from buying it elsewhere.").

Roslov's workdays lasted from approximately 7:00am to 6:30pm. His days normally started by preparing materials in his home, such as printing assignments, inventorying supplies, and building satellite dishes to save time in the field. *Id.* 98:4–100:3; 107:3–107:18; 120:20–121:18. His workdays varied for several reasons. For example, he would report to an Elite facility even if he had no work orders to complete. *Id.* 86:9–87:19. He could trade work orders with other technicians or cover another technician's assignments by simply calling DirecTV's call center and updating the work order's status with the new technician ID number. *Id.* 108:16–108:22. He also had the ability to pick up more work and take leave by requesting off from an Elite supervisor. *Id.* 114:11–115:23; 126:6–126:9.

Roslov was not paid hourly, but only by the project. *Id.* 77:10–77:13. This pay

structure was explained to him at the Elite facility, which Roslov believed was part of a verbal contract he had with Elite. *Id.* 66:9–66:15; 70:11–70:16. He was paid for line items closed on each particular work order, which was also outlined on a rate sheet that once hung on a window at an Elite shop. *Id.* 28:2–28:21. For example, a basic installation with one receiver box had one compensation amount, but additional receivers or dish upgrades had different amounts. *Id.* 29:3–29:25. Roslov recorded the work orders completed in an electronic spreadsheet, which he submitted to Elite at the end of every week. *Id.* 34:11–35:10. Finally, he sometimes performed custom labor for customers, and customers paid Roslov by check by endorsing it to his name. *Id.* 199:21–200:5.

Roslov acknowledges his paychecks came from Elite and not DirecTV. *Id.* 26:23–27:3. When he had an issue with his pay, he notified Elite, rather than DirecTV. *Id.* 38:24–39:15; 40:6–40:8. For example, he questioned Jeff Messenger, an Elite supervisor, about why his pay was reduced because of customer chargebacks, but never addressed the issue with DirecTV. *Id.* 173:11–173:24; 185:12–152:13. His only complaint to a DirecTV representative was to a quality assurance technician observing his work, in which he complained that the work order he was fulfilling was taking longer than what a standard job might take. *Id.* 41:24–41:9. Aside from this complaint, he did not submit his hours worked to Elite or to DirecTV. *Id.* 84:5–85:7. He acknowledges that he did not dispute his pay with anyone at DirecTV or complain to DirecTV that he was not receiving overtime. Indeed, he did not keep a record of the hours actually worked. *Id.* 40:6–40:12; 162:8–162:10.

While fulfilling DirecTV workorders, Roslov also attended graduate school. His classes were in the evenings, and he would work on writing his thesis on the weekends. *Id.* 44:3–45:3. After finishing school, he received notice that he would join the military, prompting him to quit installing DirecTV services in October 2011. He provided no notice to DirecTV that he was quitting, but instead notified Messenger at Elite. *Id.* 190:12–190:19.

Degraftenreed claims $63,437.50 in damages, which is made up of unpaid overtime and chargebacks. *Id.* 210:10–211:9.

## II. LEGAL STANDARD

Summary judgment is appropriate when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 249–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Once the moving party demonstrates that there is no genuine dispute of material fact, the non-moving party may not rest upon the mere allegations or denials in his pleadings. *Holden v. Hirner*, 663 F.3d 336, 340 (8th Cir. 2011). Instead, the non-moving party must produce admissible evidence demonstrating a genuine factual dispute that must be resolved at trial. *Id.* Importantly, when considering a motion for summary judgment, all reasonable inferences must be drawn in a light most favorable to the nonmoving party. *Holland v. Sam's Club*, 487 F.3d 641, 643 (8th Cir. 2007). The evidence is not weighed and no credibility determinations are made. *Jenkins v. Winter*, 540 F.3d 742, 750 (8th Cir. 2008).

## III. DISCUSSION

■ DirecTV argues that it is not Degraftenreed and Roslov's employer, and thus the FLSA does not apply. The existence of an employer-employee relationship is a prerequisite to an FLSA claim. *See* 29 U.S.C. §§ 201–219 (referencing employer and employee); *see also Childress*

v. Ozark Delivery of Mo., LLC, 95 F.Supp.3d 1130 (W.D. Mo. 2015). Whether DirecTV is the plaintiffs' employer relies on the "economic realities" of the relationship and is a question of law. See United States v. Rosenwasser, 323 U.S. 360, 362–63, 65 S.Ct. 295, 89 L.Ed. 301 (1945); Blair v. Wills, 420 F.3d 823, 829 (8th Cir. 2005); Childress v. Ozark Delivery of Mo. L.L.C., 95 F.Supp.3d 1130, 1139 (W.D. Mo. 2015).

■ Courts analyze the economic reality in two different contexts: (1) if there are multiple hiring entities, whether the defendant can be considered a joint employer, or (2) if a plaintiff has been classified as an independent contractor, whether the defendant should have classified the plaintiff as an employee. See Chao v. Westside Drywall, Inc., 709 F.Supp.2d 1037, 1061 (D. Or. 2010). The context determines the applicable test. See Keeton v. Time Warner Cable, Inc., Case No. 2:09–CV–1085, 2011 U.S. Dist. LEXIS 71472 (S.D. Ohio July 1, 2011) (differentiating tests). When a plaintiff alleges multiple companies are joint employers, courts consider whether the alleged defendant-employer (1) possessed the power to hire and fire the plaintiff; (2) supervised or controlled plaintiffs' work schedules or conditions of employment; (3) determined the rate or method of payment; and (4) maintained employee records. See Roeder v. DIRECTV, Inc., Case No. C14–4091 MWB, 2015 WL 5603050, 2015 U.S. Dist. LEXIS 126230 (N.D. Iowa Sept. 22, 2015); see also Chao v. A–One Medical Services, Inc., 346 F.3d 908, 917 (9th Cir. 2003) (factors appropriate when "a company has contracted for workers who are directly employed by an intermediary company"). In contrast, allegations that the plaintiff was actually a company's employee rather than an independent contractor trigger different factors: (1) extent of defendant's control over plaintiffs; (2) plaintiffs' investment in their own business; (3) extent of whether plaintiffs' profit or loss was determined by defendant; (4) the skill and initiative in performing the job; (5) the permanency of the relationship; and (6) the extent to which the work was integral to defendant's operations. Krupicki v. Eagle One, Inc., Case No. 4:12–CV–00150 KGB, 2014 U.S. Dist. LEXIS 46038, at *10 (E.D. Ark. Apr. 3, 2014).

■ The analysis here is complicated because of the relationship between the parties. DirecTV is connected to the Service Providers through a service agreement, and the Service Providers are connected to the technicians by separate hiring agreements. Indeed, both Degraftenreed and Roslov acknowledge that no agreement connected them to DirecTV. Degraftenreed Dep. 184:24–185:2, 60:14–60:25; Roslov Dep. 20:24–21:4, 70:11–70:13. This lack of privity initially suggests the lack of any relationship between DirecTV and the technicians. See Zheng v. Liberty Apparel Co., Inc., 355 F.3d 61, 74 (2d Cir. 2003) ("Where, on the other hand, employees work for an entity (the purported joint employer) only to the extent that their direct employer is hired by that entity, this factor does not in any way support the determination that a joint employment relationship exists."). To be clear, it is reasonable that Degraftenreed and Roslov believe that they worked for DirecTV: they wore DirecTV apparel, worked only on DirecTV work orders, and were reminded of DirecTV's standards. This subjective belief does not, however, enter into the economic realities analysis. See Hopkins v. Cornerstone America, 545 F.3d 338 (5th Cir. 2008) ("While this may be accurate, subjective beliefs cannot transmogrify objective economic realities. A person's subjective opinion that he is a businessman rather than an employee does not change his status." (in-

ternal quotations omitted)); *Chavez v. Montes*, Case No., 2015 WL 3604226 (W.D. Ark. June 5, 2015) ("[A]n employee's subjective belief as to her status as either an employee or independent contractor is immaterial to the question of liability under the FLSA.").

### 1. Degraftenreed

As an initial matter, DirecTV did not move for judgment against Degraftenreed for the lack of an employee-employer relationship, but instead inferred the absence of a relationship to support its other arguments. Degraftenreed responded to those arguments and emphasized the existence of the relationship. Indeed, Degraftenreed moved for partial summary judgment on that issue. *See* Pls.' Mem. Supp. Mot. Partial Summ. J. 4–22, Doc. No. 65 (plaintiffs arguing DirecTV is employer). Therefore, determining whether the employer-employee relationship exists at all is ripe for a decision. *See Lester v. Wildwood Financial Group, Ltd.*, 205 F.3d 1346, 1346 (8th Cir. 2000) (granting judgment *sua sponte* appropriate when there is notice and an opportunity to present evidence and argument); *Madewell v. Downs*, 68 F.3d 1030, 1048–49 (8th Cir. 1995) (constructive notice sufficient).

It is unclear whether Degraftenreed believes DirecTV is a joint employer or simply misclassified him as an independent contractor. In his complaint, he acknowledges that Service Providers hire technicians, suggesting the Service Providers are an employer and that DirecTV must be a joint employer, *see* Compl. ¶ 37, but now references independent contractors. *See* Mem. Supp. Mot. Partial Summ. J. 6–7, Doc. No. 65. Regardless, DirecTV is not Degraftenreed's employer.

#### a. Joint Employer

█ Assuming the Service Provider was his employer, Degraftenreed's claim depends on DirecTV being a joint employer.

The facts are largely undisputed, though the parties disagree on how those facts apply to the law.

The four factors for determining joint employment demonstrate DirecTV was not a joint employer. Regarding the first factor (authority to hire and fire), it is unquestionable that DirecTV has a role in hiring and firing technicians, but this is limited to quality control. By establishing baseline criteria, DirecTV created guidelines for contractors to rely on when hiring personnel. This quality control, however, is not the type of authority contemplated by the FLSA. *See, e.g., Jacobson v. Comcast Corp.*, 740 F.Supp.2d 683, 689 (D. Md. 2010). Indeed, there is no evidence that Degraftenreed's hiring decision (or any of the technicians hired by his Service Provider) were directed by DirecTV. Perhaps the most significant evidence is Degraftenreed himself: ProSat made the decision to begin Degraftenreed's training before Degraftenreed possessed the requisite training and background checks, and when Degraftenreed terminated employment, he delivered his termination notice to Stricklin, not DirecTV. Degraftenreed Dep. 102:19–103:22; 121:17–121:21.

Second, supervision and control asks whether the putative employer exercises "effective control of the terms and conditions of the plaintiff's employment." *Zheng v. Liberty Apparel Co., Inc.*, 355 F.3d 61, 74–75 (2d Cir. 2003); *see also Rutherford Food Corp. v. McComb*, 331 U.S. 722, 724–26, 67 S.Ct. 1473, 91 L.Ed. 1772 (1947) (comparing control to setting work schedules or altering work conditions). DirecTV's installation guidelines and quality control mechanisms will not, on their own, suggest an employment relationship. *See, e.g., Jacobson*, 740 F.Supp.2d at 690 ("detailed instructions and a strict quality control mechanism will not, on their own, indicate an employment relationship"). Indeed,

Degraftenreed could decide on his own which jobs to perform first if he was double-booked; he could request additional work if he wanted it; and he could avoid being assigned additional work without recourse at his discretion. Degraftenreed Dep. 137:6–137:25; 156:2–156:6; 164:11–164:25. This background leans against employer status.

Regarding rate of pay, DirecTV had no involvement in Degraftenreed's compensation. DirecTV did not issue his paychecks because his direct deposits came from the Service Provider. There is no evidence that DirecTV instructed the Service Providers how to pay its employees. The evidence does show, however, that DirecTV paid a Service Provider by terms outlined in the service agreement. While Degraftenreed is entitled to an inference that the Service Provider's decision to pay him a certain amount may be influenced by the compensation it received from DirecTV, this is no different than any other contractor relationship, which is not the control contemplated by the FLSA. *See Tafalla v. All Fla. Dialysis Serv., Inc.*, 2009 WL 151159 (S. D. Fl. 2009) (noting a hospital does not contractor subcontractor's pay merely because the contractor's decision to compensate subcontractor might be influenced by hospital's compensation scheme). The record cannot be reasonably disputed that the Service Providers, not DirecTV, determined how their technicians would be paid.

Finally, there is some evidence to suggest that DirecTV maintains records for technicians, namely identification numbers, names, and status information. This type of information is nothing more than quality control information. *See Jacobson,* 740 F.Supp. at 692. There is no evidence that DirecTV maintained files more commonly part of employment records such as pay stubs, employment applications, and tax forms. Indeed, the background check form—a form Degraftenreed signed to be considered for employment—came from ProSat, not DirecTV. Thus, there is simply not sufficient evidence to suggest DirecTV maintained employment records.

Considering these circumstances, DirecTV could not be a a joint employer.

b. Independent Contractor

■ If Degraftenreed had any relationship with DirecTV, it was that of an independent contractor.

The first (degree of control over Degraftenreed) and third (control over profit and loss) factors go hand in hand, and both weigh against employer status. Although it is true that DirecTV initially assigned Degraftenreed's work orders, he acknowledges that local technicians modified his routes, thus limiting much of DirecTV's control. Even if he had been assigned orders, he testified that he could take days off; he could decide not to take additional orders at the end of the day without recourse; and he could complete some work orders in any order if he was double-booked. *Id.* 156:2–156:6; 181:16–182:6. While DirecTV's installation standards and uniform requirements certainly provided expectations, installation specifications and quality control measures are "entirely consistent with the standard role of a contractor who is hired to perform highly technical duties." *Herman v. Mid–Atl. Installation Servs.*, 164 F.Supp.2d 667, 672 (D. Md. 2000). Importantly, this control does not negate the reality that Degraftenreed was still operating as a "separate economic entity." *See Usery v. Pilgrim Equip. Co.*, 527 F.2d 1308, 1312–13 (5th Cir. 1976). Accordingly, the extent of control and Degraftenreed's control over his own profits weighs against employer status. *Kirsch v. Fleet Street, Ltd.*, 148 F.3d 149, 171 (2d Cir. 1998) (Particularly relevant to the control factor is whether a worker is "free to set his own

schedule and take vacations when he wanted.").

The second (investment in the business), fourth (degree of skill required), and fifth (permanancy of employment) factors, weigh strongly in DirecTV's favor. Degraftenreed purchased his own equipment, tools, and supplies, his own fuel and insurance, and used his own cell phone and computer system, for use in completing the DirecTV orders. This is a significant investment, favoring independent contractor status. *See, e.g., Krupicki,* 2014 U.S. Dist. LEXIS 46038, at *14–18. As for the skill required, Degraftenreed admits that specialized training and skills are required and that someone off the street cannot perform the job. Dep. 120–121. Indeed, "[t]he skills involved in cable installation and service are akin to carpentry and electrical work." *Herman,* 164 F.Supp.2d at 675. "Workers in these trades—including [cable installers]—are traditionally designated as independent contractors." *Scruggs v. Skylink, Ltd.,* 2011 WL 6026152, at *7 (S.D. W.V. Dec. 2, 2011). Finally, there is no evidence to suggest that he expected his work to continue, uninterrupted, for any duration of time. It is true that he worked for the Service Provider for many months; however, he also worked another job along side his installation job. He also testified that there were occasions when he had no work and that work orders fluctuated. Therefore, permanance is lacking. *See Scruggs,* 2011 WL 6026152 at *7 ("The more permanent the relationship, the more likely the worker is to be an employee. Further, greater exclusivity may imply an employment relationship." (internal quotations omitted)).

The sixth factor (the importance of Degraftenreed's work on DirecTV's business) is arguably the only factor suggesting he was an independent contractor. This conclusion is unfounded, however, because the fact that a business depends on its independent contractors is not itself indicative of an employment relationship. *See, e.g., Scruggs,* 2011 WL 6026152, at *8 (technicians are critical to cable providers, but that factor alone cannot tip the scales). A rule otherwise would transform any independent contractor into an employee simply because the work performed—whether the construction of a new warehouse, installation of phone lines, or creating new marketing materials—was important to the business.

In view of these factors, if any relationship exists between DirecTV and Degraftenreed, is that of an independent contractor.

#### c. Conclusion

While it is true that Degraftenreed may very well perceive that he worked for DirecTV, the law does not recognize that DirecTV was his employer. In the absence of an employer-employee relationship, the FLSA does not apply, and Degraftenreed's claim must be dismissed with prejudice.

#### 2. *Roslov*

DirecTV moved specifically on the point that Roslov was an independent contractor and not an employee. Under the circumstances, however, Roslov will be examined within the same two contexts.

#### a. Joint Employer

■ DirecTV cannot be Roslov's employer for many of the same reasons it cannot be Degraftenreed's employer.

Similar to Degraftenreed, DirecTV had little role in hiring and firing Service Provider technicians aside from establishing minimum requirements. Roslov responded to an advertisement and met with Elite representatives to review requirements. At no time did he speak to a DirecTV employee. *See* Roslov Dep. 55:16–55:6; 56:17–57:20; 57:25–58:19; 70:7–70:10. When he

terminated employment, he did not report this to DirecTV, but rather to Elite. *Id.* 190:12–190:19. His training, which presumably went to helping Roslov become eligible to complete work orders, was conducted by Elite. *Id.* 65:12–65:15; 65:3; 65:11; 23:22–24:24; 66:23–67:3; 23:22–24:6. There is no evidence that DirecTV directed that Elite hire Roslov or any other technicians. Thus, the lack of control weighs against employer status.

Regarding supervision and control, Roslov had flexibility throughout his day. He decided on his own to build satellite systems in his home rather than in the field, *id.* 98:4–100:3; 107:3–108:18; 120:20–121:18; he could cover another technician's assignments, *id.* 108:16–108:22; and he could negotiate with other technicians to either help him with his work orders or help other technicians with their orders, *id.* 150:5–150:25. If he was double-booked, he could preference one order over the other to minimize the time spent in the car and money spent on gas, *see id.* 146:9–146:18; he could work jobs in addition to fulfilling DirecTV work orders if he chose to do so, *id.* 156:18–156:24; and he was not directed to purchase any of his supplies from any single vendor, but could shop around as he saw fit, *id.* 161:18–161:20. Aside from the quality control guidelines, DirecTV did not sufficiently control Roslov's daily activities.

Regarding the pay structure, there is no evidence that DirecTV mandated or controlled Roslov's pay, but rather significant evidence that Elite controlled it. Roslov believes that his pay structure was incorporated into a verbal contract he had with Elite, *id.* 66:9–66:15; 70:11–70:16, which was also outlined on a rate sheet that hung out at an Elite facility, *id.* 28:2–28:21. His paychecks came from Elite, and when he had an issue with his pay, he confronted Elite, not DirecTV. *Id.* 38:24–39:15; 40:6–40:8. Even if Elite's rate of pay was influ-

enced by how much Elite received from DirecTV, this is not sufficient to satisfy this factor.

Finally, it cannot be disputed that DirecTV did not maintain Roslov's employment records. While DirecTV maintained onside status data, there is no evidence in the record that DirecTV maintained any other employment paperwork.

Accordingly, the economic reality is that DirecTV was not a joint employer.

### b. Independent Contractor

█ If there was any relationship between Roslov and DirecTV at all, it had to be that of an independent contractor.

Regarding control, the inquiry remains whether DirecTV exerted such significant control that Roslov was no longer a separate economic entity in business for himself. *See Usery v. Pilgrim Equip. Co.,* 527 F.2d 1308, 1312–13 (5th Cir. 1976). Of particular importance here is whether Roslov was "free to set his own schedule and take vacations when he wished," *Kirsch v. Fleet Street, Ltd.,* 148 F.3d 149, 171 (2d Cir. 1998), and it is undisputed that Roslov could do so. He was able to switch work orders with other technicians as needed, Roslov Dep. 108:12–108:25; pick up more work if he desired it, *id.* 114:8–114:18; decide to save time on the work site by assembling dishes at home, *id.* 122:10–122:17; and take time off as needed, *id.* 125:20–126:12. He could decide which orders to fulfill first if double booked, *id.* 146:9–146:18, and had the flexibility to "hire" other Elite technicians to help fulfill his work orders, *id.* 150:5–150:25. He was not restrained from engaging in outside work, *id.* 156:18–156:24, and if he was contacted to perform an installation job on a new lead, he had the opportunity to deny it, *id.* 19:6–20:3. This supports a finding that Roslov was an independent contractor.

Regarding Roslov's investment in his own business and his personal control over profit and loss, Roslov was in control. There were no agreements guaranteeing Roslov a certain income level each week, yet Roslov could take on additional work orders to make more money, hire other technicians to help him work orders, or work another technician's order to supplement his own income. *See Browning v. Ceva Freight, LLC*, 885 F.Supp.2d 590, 608 (E.D. N.Y.2012) (noting lack of guaranteed income and ability to make more money based on own actions). Furthermore, Roslov made a number of decisions to determine his overall profitability, such as where to buy his uniforms, where to purchase tools and equipment, how to save money on fuel. He recognized that these were significant investments—indeed, many putative technicians did not return to training after learning of the requirement. While DirecTV had a preferred vendor for these purchases, Roslov could make the choice on his own where to purchase items. Thus, the extent of DirecTV's control was minimal.

The third factor, degree of skill, weighs against finding an employer relationship. As previously noted, technicians must possess specialized skills to properly align and install satellite systems. *See Herman*, 164 F.Supp.2d at 675; *Scruggs*, 2011 WL 6026152, at *7; *Carrell v. Sunland Const., Inc.*, 998 F.2d 330, 333 (5th Cir. 1993) ("That the [companies] tested and certified each [worker] before a job demonstrates the specialized nature of the work."). Roslov's ability to better his skills over time could result in additional work orders, *see* Roslov Dep. 168–22–170:7 (discussing proficiency over time), and could prevent him from having to turn over work orders to other technicians. While he had to follow standards in performing installations, these standards did not negate the independence he had in making decisions, such as negotiating with customers to prompt

direct compensation from a customer for custom labor. *See Brock v. Superior Care, Inc.*, 840 F.2d 1054, 1060 (2d Cir. 1988) (nurses who cannot use skills to build business weighs against independent contractor status).

██ Regarding permanence, "[t]he more permanent the relationship, the more likely the worker is to be an employee." *Schultz v. Capital Int'l Security, Inc.*, 466 F.3d 298, 309 (4th Cir. 2006). Here, there is no evidence that the Roslov agreed to work for DirecTV for any duration or that Roslov was prohibited from obtaining similar work after he stopped installing DirecTV systems. *See, e.g., Harris v. Skokie Maid and Cleaning Service, Ltd.*, Case No., 2013 WL 3506149, at *9 (N.D. Ill. July 11, 2013) (noting a non-compete extended contractually extended employment when workers would normally be free to use skills in open market). Roslov was not prohibited from outside work, and he testified that there were times when he had no work. Roslov Dep. 86:6–86:17, 156:18–156:24. Thus, permanence is lacking.

As was the case with Degraftenreed, the importance of installing satellite dishes is arguably the only factor leaning in finding an employer-employee relationship, which DirecTV concedes. Def.'s Opp. Pls.' Mot. Partial Summ. J. 12–13, Doc. No. 71.

Notwithstanding that the final factor favors employment status, the ultimate conclusion after considering the factors is that as a matter of law, DirecTV was not Roslov's employer. *See Browning*, 885 F.Supp.2d at 610 ("[W]hile the Plaintiffs' work was integral [the defendant], this factor only weighs slightly in favor of finding that the Plaintiffs should qualify as employees under the FLSA, and would not prevent the Court from finding, as a matter of law, that the Plaintiffs are independent contractors."). Accordingly, DirecTV's

motion for summary judgment against Roslov is granted.

### c. Conclusion

There is no employer-employee relationship between Roslov and DirecTV. Accordingly, the FLSA does not apply and Roslov's claim is dismissed with prejudice.

## IV. CONCLUSION

For the aforementioned reasons, defendants' motion for summary judgment [Doc. No. 59] is granted as to Boris Roslov, and Roslov's claim is dismissed with prejudice. Reginald Degraftenreed's claim is dismissed *sua sponte* with prejudice. All remaining motions are denied as moot.

IT IS SO ORDERED this 4th day of November 2016.